**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

REGINALD BYRON CLEMONS, et al.,    )
                                          )
        Plaintiffs,              )
                                          )
        vs.                     )     Case No. 4:22-CV-158 SRW
                                          )
MICHELLE BASHAM, et al.,       )
                                          )
        Defendants.       )

**MEMORANDUM AND ORDER**

This matter comes before the Court on Defendants' Motion to Dismiss (ECF No. 46). The motion is fully briefed and ready for disposition. The named and served parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). For the following reasons, Defendants' Motion will be granted in part, and denied in part.

**I.      BACKGROUND**

In January 2022, *pro se* Plaintiffs Reginald Byron Clemons, Steven Stafford, and Wendell Harris filed a complaint against Defendants Michelle Basham, Carl Hart, and Mike Miller alleging Defendants violated their First and Eighth Amendment rights when they allegedly attacked Plaintiffs while they were praying. On the Court's initial review of the complaint, the Court struck Plaintiffs Stafford and Harris from the matter and opened separate cases for them because multiple prisoners cannot pursue a single lawsuit while proceeding in forma pauperis. ECF No. 7. The Court then reviewed the complaint under 28 U.S.C. § 1915(e)(2)(B) and ordered Plaintiff Clemons to file an amended complaint due to multiple pleading deficiencies. Plaintiff Clemons did so, and the Court reviewed the amended complaint

1

under § 1915(e)(2). The Court dismissed all of the claims except for the claim for excessive force against Defendant Miller. ECF No. 13.

In early 2023, three attorneys entered their appearance for Plaintiff Clemons and moved to file a second amended complaint, which was filed on March 2, 2023. The second amended complaint asserted claims on behalf of Plaintiffs Clemons, Stafford, Harris, Moore, Howard, Holliman, Hood, Kent, and Smith. The Court ordered Plaintiffs to either move to vacate Plaintiff Clemons' in forma pauperis status and pay the remainder of the filing fee or to file separate civil actions. Plaintiff Clemons chose to vacate his in forma pauperis status and promptly paid the full filing fee. On June 16, Plaintiffs filed a fourth amended complaint adding several plaintiffs and defendants. ECF No. 45.[1] The fourth amended complaint, the subject of the pending motion to dismiss, includes the following parties and claims:

**Plaintiffs**: Reginald Clemons, Steven Stafford, Wendell Harris, Montrell Moore, Pre'Marcus Howard, Mark Holliman, Vincent Hood, Mandell Kent, and Michael Smith.

**Defendants**: Missouri Department of Corrections ("MDOC") Director Anne Precythe, Deputy Director Matt Sturm, Supervisor of Religious and Spiritual Programming Douglas Worsham, Eastern Reception, Diagnostic, and Correctional Center ("ERDCC") Warden David Vandergriff, Deputy Warden Matt Raymond, Shift Supervisor Lieutenant Michelle Basham, Sergeant Carl Hart, Officer Dennis Spradling, Officer Jacob Reagan, Officer Gary Fenwick, Officer Adam Simonton, Case Manager Jamie Williams, Case Manager McFarland, Medical Director John/Jane Doe, Nurse Jane Doe, Jefferson City Correctional Center ("JCCC") Warden Doris Falkenrath, Southeast Correctional Center ("SECC") Warden Bill Stange, Missouri Eastern Correctional Center ("MECC") Warden Gregory Hancock, Farmington Correctional Center ("FCC") Warden Teri Vandergriff, Algoa Correctional Center ("ACC") Warden Kelly Morriss, and unknown officers X-Y.

**Claims**:
(1) Violation of First Amendment, Free Exercise under 42 U.S.C. § 1983 against all Defendants;

---

[1] Plaintiffs did not file a Third Amended Complaint.

(2) Violation of the Eighth Amendment, Use of Force under § 1983 against ERDCC Individual Capacity Defendants;[2]

(4)[3] Violation of the Eighth Amendment, Deliberate Indifference under § 1983 against ERDCC Individual Capacity Defendants;

(5) Violation of the Fourteenth Amendment, Equal Protection under § 1983 against Individual Capacity Defendants;[4]

(6) Violation of the Religious Land Use and Institutionalized Persons Act, Free Exercise under 42 U.S.C. § 2000cc(a) against Official Capacity Defendants;[5]

(7) Violation of the First Amendment, Establishment Clause against ERDCC, FCC, ACC, JCC, and MECC Official Capacity Defendants;[6] and

(8) Violation of Missouri Tort Law, Battery against Individual Capacity Defendants.

For purposes of this order, the Court accepts the following facts as alleged in Plaintiffs' fourth amended complaint as true:[7]

## A.    The Attack

Plaintiffs are Muslims who, in accordance with their religious beliefs, pray five times a day in clean areas and on top of clean surfaces. When possible, Plaintiffs seek to pray in groups to secure the spiritual reward conferred on those who pray together. When together, a prayer leader will stand in front of everyone else, while the others stand shoulder to shoulder. As the prayer leader supplicates and recites verses from the Quran, the others bow at the waist with hands on their knees, then touch their forehead to the rug, ending the prayer sitting with their legs underneath them.

On February 28, 2021, in the housing unit 4B at ERDCC, an "honor dorm," the Muslim prisoners began their evening prayer. Plaintiffs cleaned the floor in the back of the wing, and laid

---

[2] The ERDCC Individual Capacity Defendants are David Vandergriff, Raymond, Basham, Hart, Spradling, Reagan, Fenwick, Simonton, Williams, and McFarland.

[3] The Fourth Amended Complaint does not include a Count 3.

[4] The Individual Capacity Defendants are David Vandergriff, Raymond, Basham, Hart, Spradling, Reagan, Fenwick, Simonton, Williams, McFarland, Falkenrath, Stange, Hancock, Teri Vandergriff, and Morriss.

[5] The Official Capacity Defendants are Precythe, Sturm, Worsham, David Vandergriff, and Raymond.

[6] The Court is unsure of which Defendants are the ERDCC, FCC, ACC, SECC, JCC, AND MECC Official Capacity Defendants. The only defendants listed as sued in their official capacities are Precythe, Sturm, Worsham, David Vandergriff, and Raymond.

[7] Hereinafter referred to as the "complaint" unless otherwise specified.

out nine prayer rugs. Defendant Basham saw Plaintiffs as she made her rounds, and walked on as guards had done hundreds of times before. Plaintiffs had been praying together in the housing unit's common space several times a day since the prison locked down their chapel in response to the COVID-19 pandemic. That day, they had prayed together three separate times. Plaintiff Stafford led the prayer with Plaintiffs Holliman, Hood, Kent, Smith, Howard, Harris, Moore, and Clemons in a single-file row facing him.

Sometime between 9:10 and 9:30 p.m., the men began praying. Shortly thereafter, Defendant Basham walked into the wing. She had previously told Plaintiff Stafford to remove his kufi, a brimless, short, round cap worn by Muslim men. When Plaintiff Stafford saw Defendant Basham approaching, he removed his kufi to prevent any disturbance. Defendant Basham told Plaintiffs they could not pray there. She said, "Stop praying now," and "There's no praying outside the chapel." Plaintiff Stafford attempted to quickly complete the prayer, as his religious beliefs required him to do.

When Plaintiffs did not immediately stop their prayer, Defendant Basham shouted an officer in distress call, code 10-5, into her radio and a directive to "get me 10 beds ready in 2 house," one of the housing units used for segregated custody. Code 10-5 is usually reserved for guards who are being assaulted or otherwise attacked by a group of prisoners. Upon hearing this, Plaintiffs Kent and Smith stopped praying, stood up, and stepped away from the other plaintiffs who continued their prayer. Defendant Carl Hart, and up to 20 additional officers, including Defendants Reagan, Fenwick, and Simonton, arrived and surrounded Plaintiffs. Officers pointed fire-extinguisher-sized pepper spray cannisters at Plaintiffs.

Plaintiffs and other prisoners knew Defendant Hart to be volatile and violent. He was regarded as an enforcer. A few years earlier, he had been removed from Ramadan food delivery

4

after telling some of the prisoners that he had PTSD from having been "trained to kill Muslims in Afghanistan," objecting that he now "has to feed these motherfuckers." Now facing these Muslim prisoners, Defendant Hart instructed officers to use violence and mace to stop Plaintiffs from praying. He announced that all Plaintiffs would be placed in disciplinary segregated custody. Defendant Hart repeatedly screamed, "Submit to restraints or get sprayed!" As guards filed in around the left side of the room, a few officers walked behind Plaintiffs, ready to handcuff and escort them away. Defendants instructed other prisoners in the wing to return to their cells and lock down.

Plaintiffs Kent and Smith, who had stopped praying, were allowed to walk to their cells and remain there. Plaintiffs Holliman and Hood stopped praying when officers pointed pepper spray at them. The officers then had them stand and cuffed them. Officers escorted Plaintiff Holliman, who is white, but not Plaintiff Hood, who is Black, out of range of the pepper spray attack, saying, "Let's get you out of here before you get sprayed." Defendant Hart attempted to pepper spray Plaintiff Hood, but missed, and almost hit the guard standing behind Plaintiff Hood. Defendant Hart and other officers began pepper spraying Plaintiffs Howard, Harris, Moore, Clemons, and Stafford at point-blank range.

Defendant Hart sprayed Plaintiffs Howard, Harris, Moore, and Clemons across their heads, then up and down their torsos. He went back and forth down the line of men without taking his finger off the trigger. While other officers moved to handcuff Plaintiffs, Defendant Hart concentrated his spray on Plaintiff Harris. He held the spray canister less than three inches from Plaintiff Harris' skin, drenching the top and back of his bowed head and shoulders. The chemical agent dripped into Plaintiff Harris' face, eyes, and down his hoodie, saturating the fabric. Defendant Hart then turned to Plaintiff Stafford and sprayed him directly in the nose,

mouth, and eyes. As Plaintiff Stafford fell to the floor in anguish, Defendant Hart continued to saturate his head, face, and shirt.

As an officer began to cuff Plaintiff Stafford, Defendant Hart asked, "Where's the leader?" Plaintiff Stafford turned to Defendant Hart, who sprayed him a second time, saturating his face from one inch away. The spray filled Plaintiff Stafford's right ear, nose, and mouth, inflaming his lungs, and triggering his asthma and chronic obstructive pulmonary disease. His ear was so full of pepper spray, it badly impacted his hearing. He could not see or breathe, and the pain was so intense, it felt as if Defendant Hart had poured boiling water over Plaintiff Stafford's face.

Plaintiff Moore, who was attempting to peacefully finish his prayer, stood up and was hit with pepper spray to the side of his face that continued down the side of his body. An officer told him, "Turn around and cuff up." As Plaintiff Moore faced the wall with his hands behind his back, Defendant Fenwick deployed another blast of pepper spray at point-blank range. He felt the chemical agent stream into his face, causing pain and panic. Plaintiff Howard was sprayed as he was sitting on his knees with his eyes closed trying to complete his prayer. An officer picked him up under the arms and slammed him face first into the wall.

Officers dragged Plaintiffs Clemons, Stafford, Harris, Moore, Howard, Holliman, and Hood toward segregation, slamming them into walls and doors along the way. As they went through the medical unit, despite Plaintiffs' obvious physical distress, staff collected nothing more than their names and inmate numbers. No medical evaluations, eye wash, showers, cleaning supplies, or medical advice were offered. Officers then walked Plaintiffs through slushy snow and mud through a near-frozen baseball field, rather than follow the sidewalk, despite many of them wearing only socks on their feet. Once in segregation, Defendants forcibly

stripped Plaintiffs Clemons, Moore, and Harris down to their boxer shorts and wet, muddy socks. Only Plaintiff Holliman was allowed to remove his own clothes, and only Plaintiffs Hood and Harris were allowed to keep their clothing, although the clothes were saturated in pepper spray.

Defendants took Plaintiffs to 1 House, where one wing was empty and placed each plaintiff in a separate cell. The cells were stripped bare, and Plaintiffs were forced to sit, naked or nearly naked, on the cold concrete floor without mattresses, pillows, blankets, or heat. Each cell had a toilet with an attached sink, but Defendants turned off the water to most of the cells. Plaintiffs, covered in pepper spray, had no running water, and no way to even flush the toilet to get fresh water. Plaintiffs Moore and Harris were in such agony and torment, they used dirty toilet water to minimally clean themselves. For more than 15 hours, Plaintiffs Clemons, Stafford, Harris, Moore, Howard, Holliman, and Hood sat in segregation without heat, running water, lights, mattresses, blankets, pillows, or fresh clothes.

Plaintiffs Clemons, Stafford, Harris, Moore, and Howard froze from the cold and burned from the pepper spray still lingering in their eyes, noses, ears, mouths, and throats. Plaintiffs Stafford and Harris sustained skin injuries that remain today. The pepper spray affected Plaintiff Clemons' lungs, forcing him to now regularly use an inhaler. Plaintiffs repeatedly called out to the guards for medical attention, but no help came. Plaintiffs Harris and Moore attempted to wash the concentrated spray off their heads, faces, and shoulders but only caused the chemicals to drip all the way down their naked bodies. Plaintiff Harris cried out, vomited, hyperventilated, and went into shock, his entire body ablaze. While neighboring Plaintiffs called out and tried to wake him up, he convulsed and fell in and out of consciousness.

Defendants Simonton and Nurse Doe entered the unit the next morning. The nurse checked Plaintiff Harris' vitals, but an EKG machine could barely detect a heartbeat because he

was so cold and his heartrate was so low. Defendant Simonton told Nurse Doe, "Leave him in there, he's fine." Nurse Doe instructed officers to bring him a blanket but provided no further treatment.

Around 2:00 a.m., ERDCC officials entered 1 House to inform Plaintiffs they had been charged with a disciplinary infraction for "acts of organized disobedience" by three or more offenders. This is a major conduct violation usually reserved for riot organizers. Defendant Hart's report on the incident stated the violations "resulted in a spontaneous use of force" including a "short burst of O/C pepper spray to the facial region of the offender." As a matter of policy, MDOC facilities treat Muslims as gang members and assign gang task forces to deal with incidents involving Muslims.

On March 1, 2021, around 10:00 a.m., ERDCC's gang task force came to the segregation unit and told Plaintiffs they had not done anything wrong, and they were working to try and get Plaintiffs out of segregation. They stated they would take the video of the officers' assault to Defendant David Vandergriff, the warden, to decide what the officers' punishment should be. After the officers left, Bennett returned and informed Plaintiffs that Defendant Stange, then a captain at ERDCC, had been angry when he saw the video, stating, "They weren't doing anything but praying." Two days after the attack, officials summoned Muslims across ERDCC to a meeting in the chapel to address the incident. More than 70 Muslim prisoners attended. Defendant Raymond, the associate warden of ERDCC, told the group the guards' actions were wrong and they would be punished.

Each Plaintiff was called into a cursory hearing on March 9, 2021, where they were informed their charges would be reduced to "disobeying a direct order," a minor conduct violation for which they would be sentenced to ten days in segregation. Because of the time they

had already spent in segregation, Plaintiffs would be released the next day. Plaintiffs Clemons

and Stafford stated on the record, "I have not had access to the grievance procedure. I would like

to retain the use of force video for civil litigation." Plaintiffs pleaded not guilty to all charges, but

were found guilty. They were released from segregation on March 10, 2021.

### B.      The Aftermath

#### 1.      Plaintiff Clemons

Before the incident, Plaintiffs were residents of ERDCC's honor dorm and were trusted,

dutiful members of the prison community. They had clear records marked by consistent good

behavior. Plaintiff Clemons participated in Institutional Treatment Center ("ITC") programming

and was on an "ITC transfer hold" at ERDCC, meaning he was to remain at ERDCC to continue

his participation in the programming. He was also approved to take classes through Ashland

University in May 2021, and accordingly, was on an educational transfer hold. However, on

October 25, 2021, Plaintiff Clemons was transferred to JCCC. One week before the transfer,

Defendant Raymond told Plaintiffs Clemons and Stafford, "It's over now," and it was time to

stop filing grievances. Plaintiffs refused to stop, insisting their conduct violations be expunged

and their excessive force claim meaningfully investigated. Plaintiff Clemons was transferred

without warning, and his conduct violation was expunged four days after leaving ERDCC.

Plaintiff Clemons remains incarcerated at JCCC, where he has been denied entry to

training and educational programs. JCCC is three hours further away than ERDCC from Plaintiff

Clemon's hometown, making it more difficult for his wife and mother to visit him. Shortly after

he was transferred, JCCC blocked his wife from visiting. She has not been able to visit despite

attempts to do so.

## 2. Plaintiff Stafford

Defendants considered Plaintiff Stafford the leader of the group because he was leading the prayer on the day of the attack. After he was restrained and escorted out of the housing unit by three officers, Defendant Spradling, at Defendant Hart's direction, lifted Plaintiff Stafford off the ground and slammed him face down onto the concrete. Defendant Spradling then dropped all of his weight onto his knees in the middle of Plaintiff Stafford's back. Officers knelt with both knees on his legs to hold him down. One of the officers pulled Plaintiff Stafford's head up from the pavement to expose his neck while Defendant Reagan pressed an elbow to his windpipe. Blind and struggling to breathe from the pepper spray, Plaintiff Stafford repeatedly rasped, "Why are you doing this? I can't breathe! I can't breathe!" Defendant Hart replied, "If you're talking, you're breathing."

Plaintiff Holliman heard the attack as he was being led down the sidewalk and turned around shouting, "Hey! What are you doing? Get off of him!" Defendant Hart responded, "You should have thought about that before you started praying!" Defendant Hart attempted to spray Plaintiff Stafford with his pepper spray again, but the can was empty. Defendant Fenwick said, "If that can is empty, you better throw it away." Officers then shackled Plaintiff Stafford's ankles, picked him up, and dragged him to segregation.

When they arrived in segregation, Defendants Simonton, Reagan, Spradling, and Hart again slammed Plaintiff Stafford face first onto the floor. Officers beat and kicked him as he cried, "Why are you doing this to me? I'm not fighting!" Defendant Simonton asked Defendant Hart for the key to Plaintiff Stafford's cuffs so they could remove his pepper-spray-saturated clothing. Defendant Hart said, "No, cut it off. Fuck him." While the other officers watched, Defendant Simonton cut off Plaintiff Stafford's jacket, t-shirt, sweatpants, shorts, and boxers

10

while he begged them to stop. As a means of intimidation and humiliation, Defendant Simonton reached under Plaintiff Stafford's boxers and groped his genitals as he cut the garment into pieces. Plaintiff Stafford was frozen in fear of what might happen next. He could not breathe and felt like vomiting.

After Plaintiff Stafford's clothing was removed, Defendant Hart produced the handcuff key from his pocket and laughed, removing the restraints on his way out the door. Around 30 minutes later, a guard brought Plaintiff Stafford a new pair of boxer shorts. He put them on and within ten seconds felt intense burning in his genitals. He removed them to find a bright orange line of OC liquid deliberately sprayed in the crotch of his underwear, from genitals to anus.

Plaintiff Stafford was denied medical treatment for weeks despite repeatedly requesting such treatment. For two years, he has suffered the effects of severe post-traumatic stress disorder and aggravated asthma, which remain unchecked and untreated despite his requests. After he returned from segregation and resumed his job, Defendants imposed special strip search requirements on him. At Defendant Hart's direction, officers subjected him to humiliating strip searches before he could go into the kitchen to work during the month of Ramadan. No other kitchen workers were subjected to these searches, and Plaintiff Stafford had never been subjected to them before. About one month after his release from segregation, Plaintiff Stafford was fired from his $40 per month kitchen job with no documentation or evidence of wrongdoing.

### 3.    Plaintiff Harris

Officers have written Plaintiff Harris up on so many conduct violations, he has spent more than 12 of the last 24 months in segregation. When he is in segregation, Plaintiff Harris is usually in a cell alone and in lockdown for 23 hours a day. Defendants place his personal property in storage, where it usually gets lost, leaving him with only two outfits and writing

implements. He is denied access to his paperwork and to the grievance process. He is allowed to write his parents or send kites to his case manager, but his case manager ignores them. He is not allowed to communicate with anyone else, and he is subjected to random, humiliating strip searches without warning.

The many write-ups have caused his security level to rise. As a result, he is not allowed to attend classes, work, or participate in other programs. This could also affect his release date. In March 2021, Defendants transferred Plaintiff Harris out of the honor dorm after a write-up. As they moved him to and from segregation, they frequently raided his cell to identify conduct violations that could become the basis for additional punishment. In general population, rather than the honor dorm, Plaintiff Harris was cut off from other Muslims and his faith, and he was harassed and tormented by white supremacists. One attacked him and the altercation that ensued landed Plaintiff Harris back in isolation for eight months.

In August 2021, during a raid of his cell, Defendant Fenwick broke Plaintiff Harris' prescription eyeglasses. Plaintiff Harris repeatedly messaged Defendants McFarland and Williams requesting new glasses, but they ignored him. He waited eight months for new glasses, and then, in February 2022, a different guard broke the arms off of his glasses only one month after he got them. Plaintiff Harris has been without functional glasses since them. He ties a string around each end of his broken lenses to hold them on his face in a desperate attempt to see. When he requests replacements, officers threaten to write him for possessing contraband for his modified glasses. He is afraid to push the issue for fear he will lose even this inadequate pair of glasses. The attack and its aftermath has left Plaintiff Harris feeling despondent, constantly fearful, and hopeless.

### 4. Plaintiff Moore

Plaintiff Moore, and other Muslims at ERDCC, have been denied the ability to wear religious head coverings anywhere but the chapel even though other head coverings, such as a yarmulke, may be worn in public. Many Islamic devotional items are not made available by ERDCC in any manner.

### 5. Plaintiff Holliman

Plaintiff Holliman was transferred to MECC in August 2021, two weeks after filing offender grievances about the attack. At MECC, Plaintiff Holliman is subject to MDOC's rule prohibiting prayer in any area outside the chapel or cells. Officials have allowed Christians to hold prayer circles in the yard and other areas. One particular housing unit is set aside for participants in a counseling program that features daily Christian prayer and bible study in the wing.

### 6. Plaintiff Hood

Plaintiff Hood was transferred to FCC on August 10, 2021, by request. At FCC, Plaintiff Hood is subject to the same rules as Plaintiff Holliman at MECC, whereby Muslims are not allowed to gather and pray outside of the chapel while Christians are allowed to do so. During Ramadan, Plaintiff Hood and other Muslims are only allowed to make daily prayers together in the chow hall, which is overrun with filth, roaches, and rats. Not only does the filth desecrate Plaintiff Hood's prayers, but the chow hall is also not large enough to accommodate all Muslims who wish to pray.

### 7. Plaintiff Kent

Plaintiff Kent was transferred to FCC in 2021 before being transferred to ACC in September 2022. The day after the attack, while still at ERDCC, Defendants raided his cell,

taking the shirt and shoes he had been wearing the night before. Defendants began raiding his cell almost weekly after that. Two days after the attack, at a campus-wide gathering of Muslims Plaintiff Kent told the group, including guards and Defendant Raymond, what happened during the attack. Shortly thereafter, Defendants suddenly, and without warning, pulled Plaintiff Kent from his activity in the yard and transferred him to the reception side of the facility, separating him from other Plaintiffs. On May 21, 2021, he was transferred to FCC. He did not receive any conduct violations or time in segregation from the attack, but officials at FCC brought him in for questioning about the incident when he arrived.

Now at ACC, Plaintiff Kent has been denied his applications for residence in the honor dorm despite having a clean record with no conduct violations since 2016. ACC assigned the gang task force to deal with all events related to Muslim prisoners. Officials at ACC also prohibit public prayer for Muslims. They are given chapel time once a week, although officials use any excuse to suspend or cancel those services. During two months in the spring of 2023, Plaintiff Kent and other Muslims have been allowed to hold their weekly *Jumu'ah* service only three times.

### 8.    Plaintiff Smith

Defendants denied Plaintiff Smith access to the grievance process after the attack. After the other Plaintiffs went to segregation, Plaintiff Smith requested Informal Resolution Request ("IRR") forms from his case worker. The case worker refused and told Plaintiff Smith he would have to wait two weeks to get the forms. Defendants never provided the forms.[8]

---

[8] The complaint alleges Plaintiff Howard suffered harm and was placed in segregation, but it does not include a separate section related to his individual status. ECF No. 45 at 23-33.

14

C.      **The Offender Grievance Procedure**

ERDCC prisoners may appeal any disciplinary action taken by officials against them through the facility's three-step Offender Grievance Procedure. In the first step, a prisoner must submit an IRR within 15 days of the incident in question. Prison officials must respond within 40 calendar days of the receipt of the IRR. In the second step, if prison officials have not responded, or if the IRR remedy is denied or otherwise unresolved, the prisoner may notify grievance staff and request an Offender Grievance form. The prisoner must fill out the form within seven calendar days from the date the prisoner signs the IRR response. Prison officials must respond within 40 calendar days of the filing of an Offender Grievance. In the third step, if prison officials have not responded, or the remedy is denied or unresolved, the prisoner may file an appeal. The prisoner must file the appeal within seven calendar days from the date the prisoner signs the Offender Grievance response. Prison officials must respond within 100 calendar days from the date it is received. After prison officials submit a response, the grievance procedure is concluded.

1.      **Plaintiff Clemons**

On March 9, 2021, Defendants found Plaintiffs guilty of disobeying a direct order during the attack and sentenced them to ten days of segregation. On March 15, Plaintiff Clemons filed three IRRs regarding the attack and his conduct violation. On June 23, Defendants issued denials. On July 12, Plaintiff Clemons filed grievances for two of the three IRRS. On October 29, he received a response to the grievances denying them and stating the conduct violation was dismissed and expunged from his record.

On April 16, 2021, Plaintiff Clemons filed an IRR to report retaliatory harassment from Defendants Basham and Hart. On May 24, he again filed an IRR regarding the attack. The

response stated the request was submitted for investigation and should be resolved. On August 23, he filed a grievance inquiring about the investigation. On October 27, prison officials issued a denial. Plaintiff Clemons also filed an IRR on August 9 asking to escalate all previous complaints to the next level. Defendants issued a response stating all of his IRRs had been moved to the next stage. On November 15, he filed a grievance claiming he was denied a redress of grievances as a form of administrative retaliation. He asked for an escalated review of his previous complaints. On December 12, Defendants issued a response stating all previous complaints had been escalated to the grievance or appeal stage.

### 2.   Plaintiff Stafford

On March 12, 2021, Plaintiff Stafford filed an IRR about Defendants cutting his clothes off of him after the attack. In May 2021, Defendants issued a response denying his IRR. On May 20, he filed a grievance. On November 9, Defendants denied the grievance. Plaintiff Stafford filed three appeals on October 13, January 12, 2022, and February 16. Defendants denied them all.

Plaintiff Stafford also filed an IRR about the attack on March 16, 2021. After receiving no response, on May 20, he filed a grievance. On October 13, Defendants denied the grievance. He filed an appeal on the same day which Defendants denied on November 9.

On May 3, 2021, Plaintiff Stafford filed an IRR about his retaliatory firing from his kitchen job. On August 19, he filed a grievance demanding written documentation of the basis for his termination. On October 7, Defendants issued a response deeming the matter resolved. On February 16, 2022, Plaintiff Stafford filed an appeal. On February 18, Defendants issued a response stating the matter was resolved. On March 14, Defendants issued another similar response.

On September 28, 2021, Plaintiff Stafford filed an IRR asking that the three IRRs pending for over 100 days be moved forward. Defendants responded that the grievance appeal forms had been issued and therefore the IRR was resolved.

On November 9, 2021, Plaintiff Stafford filed an IRR requesting to purchase a prayer rug from a vendor. Defendants denied the request stating, "According to several Islamic experts, prayer rugs are not a requirement for prayer, it is only required that prayers be performed in an area that is clean."

### 3.    Plaintiff Harris

On March 15, 2021, Plaintiff Harris filed an IRR requesting an investigation of the attack and expungement of the resulting conduct violation. Shortly thereafter, Defendants sent Plaintiff Harris to segregation where he has lived on and off for months at a time. Each time he is sent to segregation, Defendants deny him access to his personal paperwork and to the grievance procedure including even basic forms to file IRRs and grievances. Plaintiff Harris is unsure if Defendants ever responded to his IRR.

### 4.    Plaintiff Moore

On March 12, 2021, Plaintiff Moore filed an IRR about the attack. After six months without a response, Plaintiff Moore filed a grievance. In February 2022, Defendants issued a response, bearing no signatures or official stamps, denying his grievance. He filed an appeal the same day. Defendants denied the appeal. Plaintiff Moore does not know if his conduct violation was ever dismissed or expunged, but there are no available appeals for him to make.

### 5.    Plaintiff Howard

On March 15, 2021, Plaintiff Howard filed an IRR about the attack and related conduct violation. He did not receive a response. On December 22, he filed a grievance. Since then,

MDOC transferred him to two different facilities where they denied him access to the grievance appeal procedure.

### 6.    Plaintiff Hood

On March 15, 2021, Plaintiff Hood filed an IRR about the attack and resulting conduct violation. In August, he filed a grievance after receiving no response from Defendants. In November, Defendants responded that the conduct violation had been dismissed and expunged and denied any further relief. Shortly thereafter, Plaintiff Hood was sent to segregation on an unrelated matter and was denied access to the grievance appeal procedure.

### 7.    Plaintiff Holliman

On March 12, 2021, Plaintiff Holliman filed an IRR about the attack and resulting conduct violation. On August 1, Defendants issued a response denying the IRR. Plaintiff Holliman immediately filed a grievance. In February 2022, Defendants denied the grievance. Plaintiff Holliman immediately filed an appeal. Defendants have not responded.

### 8.    Plaintiffs Kent and Smith

Plaintiffs Kent and Smith did not file IRRs or grievances due to unavailability, futility, and fear of retaliation. Because they had gone to their cells, they did not receive the conduct violations the other Plaintiffs received. At the campus-wide meeting on March 2, 2021, Defendant Raymond assured Plaintiffs they would be allowed to pray in the wing moving forward and other religious requests would be accommodated. Defendants led Plaintiffs Kent and Smith to believe there was no reason for them to engage in the grievance procedure. After Defendants raided their cell and targeted them after the meeting, Plaintiffs Kent and Smith feared the retaliation would get worse if they filed any grievances.

18

## II.   STANDARD

The purpose of a motion to dismiss for failure to state a claim is to test the legal

sufficiency of the complaint. As the Supreme Court held in *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544 (2007), a complaint must be dismissed pursuant to Rule 12(b)(6) for failure to state a

claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief

that is plausible on its face." *Id.* at 570. A plaintiff need not provide specific facts in support of

his allegations, *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam), but must include

sufficient factual information to provide the "grounds" on which the claim rests, and "to raise a

right to relief above a speculative level." *Twombly*, 550 U.S. at 555 & n.3. *See also Schaaf v.*

*Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008). This obligation requires a plaintiff

to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Twombly*, 550 U.S. at 555. A complaint "must contain either direct or

inferential allegations respecting all the material elements necessary to sustain recovery under

some viable legal theory." *Id.* at 562 (quotation omitted). On a motion to dismiss, the Court

accepts as true all of the factual allegations contained in the complaint, and reviews the

complaint to determine whether its allegations show that the pleader is entitled to relief. *Id.* at

555-56; Fed. R. Civ. P. 8(a)(2).

## III.   DISCUSSION

In their motion to dismiss, Defendants raise several arguments in favor of dismissal. First,

they assert Plaintiffs Clemons, Stafford, Howard, Hood, Kent, and Smith did not exhaust their

administrative remedies. Second, they assert various failure to state a claim arguments. Third,

they contend Plaintiffs' battery claims are untimely except for Plaintiff Clemons' claims against

Defendants Basham and Hart. Finally, they argue Plaintiffs' claims for damages against

Defendants sued in their official capacities fail to state a claim and are barred under the Eleventh Amendment. Before addressing Defendants' arguments, the Court must address the capacity in which Plaintiffs are suing Defendants.

### A.     Capacity in which Defendants are Sued

The complaint states Defendants Teri Vandergriff, Falkenrath, Stange, Hancock, and Morriss are sued in their individual capacities. In their motion to dismiss, Defendants asked the Court to dismiss the claims against these Defendants because the complaint does not include specific allegations of what these Defendants did. In response, Plaintiffs stated these Defendants should be sued in their official capacity only and that they would amend the complaint to reflect this change. In reply, Defendants asked the Court to dismiss the claims against these Defendants in their individual capacities with prejudice.

The Court will dismiss the individual capacity claims for failure to allege personal responsibility as required by § 1983 and in accordance with Plaintiffs' statement the claims should only be against Defendants in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 165-167 (1985) (explaining the difference between official-capacity and individual-capacity suits). The Court will not construe the complaint to assert claims against Defendants in their official capacities that did not explicitly state as such in the complaint as Plaintiffs have not moved the Court to amend the complaint. However, the Court does not see any reason to dismiss these claims with prejudice, nor do Defendants provide any reason to do so. For these reasons, the Court will dismiss the claims against Defendants Teri Vandergriff, Falkenrath, Stange, Hancock, and Morriss without prejudice.

### B.      Failure to Exhaust Administrative Remedies

In their motion, Defendants assert Plaintiffs Clemons, Stafford, Harris, Howard, Hood, Kent, and Smith did not exhaust their administrative remedies. Defendants ask the Court to dismiss these Plaintiffs' claims because their failure to exhaust is evident on the face of the complaint. According to Defendants: Plaintiff Clemons, Howard and Hood did not file grievance appeals; Plaintiff Stafford failed to file is IRR within fifteen calendar days as required by MDOC's grievance procedure; Plaintiff Harris failed to file an IRR related to his eyeglasses claim and failed to file a grievance or grievance appeal for his March 15th IRR; and Plaintiffs Kent and Smith did not even file IRRs to begin the grievance process.

The Prison Litigation Reform Act requires prisoners to exhaust all administrative remedies before bringing a § 1983 action concerning prison conditions. 42 U.S.C. § 1997e(a). When a plaintiff joins multiple claims into a single suit, the PLRA requires that all available prison grievance remedies be exhausted as to all claims before proceeding in court. *Kozohorsky v. Harmon*, 332 F.3d 1141, 1143 (8th Cir. 2003). However, there is an exception to mandatory exhaustion: an inmate need only exhaust remedies "as are available." *Ross v. Blake*, 578 U.S. 632, 642–44 (2016) (enumerating circumstances when remedies are unavailable).

 "[A]n administrative procedure is unavailable when ... it operates as a simple dead end— with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 643. An inmate cannot be faulted for failing to exhaust remedies that afford no possibility of relief. *Id*. "The Eighth Circuit has held that remedies are not "available" to an inmate when prison officials fail to respond to an inmate's request for grievance forms. *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001).

The failure to exhaust administrative remedies is an affirmative defense that defendants must prove. *Jones v. Bock*, 549 U.S. 199, 212 (2007). However, if a prisoner's failure to exhaust is plain on the face of the complaint, a court may dismiss the complaint for the prisoner's failure to exhaust administrative remedies. *Jones*, 549 U.S. at 215-16.

The Missouri Department of Corrections requires prisoners use a three-step procedure for its administrative remedy system: (1) an Information Resolution Request ("IRR"), (2) a Grievance, and (3) a Grievance Appeal. A prisoner must meet the requirements of each step for their remedies to be considered exhausted under the PLRA. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). ("Exhaustion of available administrative remedies is required for any suit challenging prison conditions, not just for suits under § 1983."); *see also* 42 U.S.C. § 1997e(a).

For the following reasons, the Court finds it is not plain on the face of the complaint that Plaintiffs Clemons, Stafford, Harris, Moore, Howard, Holliman, and Hood failed to exhaust their administrative remedies. For Plaintiffs Kent and Smith, the Court finds it is plain on the face of the complaint that they failed to exhaust their administrative remedies, and the Court must dismiss their claims.

In the complaint, Plaintiffs allege Plaintiff Clemons filed at least six different IRRs related to the attack and its aftermath. ECF No. 45, ¶¶ 137-143. They also allege that on November 15, 2021, Plaintiff Clemons filed a grievance claiming he was denied redress and requesting escalated review of his previous complaints. *Id*. at ¶ 143. On December 11, 2021, Defendants issued a response stating that all previous complaints had been escalated to the grievance or appeal stage. *Id*. Based on this allegation, the Court cannot determine, on the face of the complaint, whether or not Plaintiff Clemons exhausted his administrative remedies because it is unclear which IRRs were escalated to grievance appeals. The complaint also does not detail

what exact issues were raised in each IRR so the Court cannot determine which issues were exhausted and which were not. It is not plain on the face of the complaint that Plaintiff Clemons failed to exhaust his administrative remedies. Therefore, the Court must deny Defendants' motion to dismiss for failure to exhaust as to Plaintiff Clemons.

For Plaintiff Stafford, Plaintiffs allege he filed several IRRs related to the attack and its aftermath. ECF No. 45, ¶¶ 144-148. Defendants challenge Plaintiff Stafford's IRR filed on March 16, 2021, asserting Plaintiff Stafford did not file it within the time period required by MDOC's procedure. The Court cannot determine this fact from the complaint's allegations. The complaint alleges the attack took place on February 28, 2021, between 9:00-9:30 p.m. *Id*. at ¶¶ 45, 49. It also alleges Defendants denied Plaintiffs heat, running water, lights, mattresses, blankets, pillows, and fresh clothes for more than 15 hours. *Id*. at ¶ 77. At 2:00 a.m. on March 1, ERDCC officials told Plaintiffs they had been charged with disciplinary infractions. *Id*. at ¶ 82. Based on these allegations, the attack began on February 28th and continued into March 1st. Therefore, Plaintiff Stafford's IRR filed on March 16th could be timely. Because it is not plain on the face of the complaint that Plaintiff Stafford failed to exhaust his administrative remedies, the Court will deny Defendants' motion to dismiss for failure to exhaust as to Plaintiff Stafford.

For Plaintiffs Harris, Howard, and Hood, Defendants argue the conclusory allegations these Plaintiffs did not have access to the grievance procedure are not enough to establish they did not fail to exhaust their administrative remedies. The allegations for Plaintiffs Harris, Howard, and Hood are as follows.

Plaintiff Harris filed an IRR on March 15, 2021, requesting an investigation of the attack and expungement of the resulting conduct violation. ECF No. 45, ¶ 149. Plaintiff Harris was sent to segregation shortly after the attack and has been in segregation on and off for months at a time

23

since then. *Id*. During his time in segregation, he has been denied access to his paperwork and the grievance procedure. *Id*. He is unsure if Defendants ever responded to his IRR. *Id*.

Plaintiff Howard filed an IRR about the attack on March 15, 2021. ECF No. 45, ¶ 151. He never received a response so on December 22, 2021, he filed a grievance. *Id*. After that, Plaintiff Howard was transferred to two different facilities and denied access to the grievance appeal procedure. *Id*.

Plaintiff Hood filed an IRR about the attack on March 15, 2021. ECF No. 45, ¶ 152. In August 2021, after receiving no response from Defendants, Plaintiff Hood filed a grievance. *Id*. in November 2021, Defendants responded that the conduct violation had been dismissed and expunged, and denied all other relief. *Id*. Shortly thereafter, Plaintiff was sent to segregation on an unrelated matter and was denied access to the grievance appeal procedure. *Id*.

Defendants argue these "vague" and "conclusory" allegations that Plaintiffs did not have access to their administrative remedies are not enough. In making this argument, Defendants mistakenly attempt to place the burden on Plaintiffs to show they did not have access to their administrative remedies. The failure to exhaust is an affirmative defense, and Defendants have the burden of establishing Plaintiffs did not exhaust their remedies. *See Jones*, 549 U.S. at 212. Therefore, although Plaintiffs' allegations that they did not have access to their administrative remedies are conclusory, the rest of their allegations about their access to administrative remedies are enough to make it no longer evident on the face of the complaint that Plaintiffs failed to exhaust their administrative remedies. For this reason, the Court will deny Defendants' motion to dismiss for failure to exhaust as to Plaintiffs Harris, Howard, and Hood.

For Plaintiffs Kent and Smith, Defendants argue they failed to exhaust their administrative remedies because they did not file any IRRs or grievances. In the complaint,

Plaintiffs allege Plaintiffs Kent and Smith did not file any IRRs or grievances about the attack due to unavailability, futility, and fear of retaliation. ECF No. 45, ¶ 154. Plaintiffs allege they were led to believe there was no reason for them to engage in the grievance procedure because Defendant Raymond assured them they would be allowed to pray in the wing moving forward. *Id*. Plaintiffs also allege Defendants raided their cell and targeted them after the meeting with Defendant Raymond. *Id*. Consequently, they feared the retaliation would get worse if they filed anything. *Id*.

Unfortunately for Plaintiffs Kent and Smith, an inmate's failure to exhaust his administrative remedies cannot be excused because of his belief that the grievance procedure is futile or ineffective. *Watson v. Witty*, 2018 WL 11303863 at *3 (E.D. Mo. Feb. 21, 2018) (citing *Chelette v. Harris*, 229 F.3d 684, 688 (8th Cir. 2000)). Thus, Plaintiffs Kent's and Smith's claims they did not file IRRs due to futility cannot excuse their failure to exhaust.

Plaintiffs' alleged fear of retaliation also does not excuse their failure to exhaust. For a fear of retaliation to excuse a failure to exhaust, there must be some basis from which a court can determine a "reasonable prisoner of ordinary firmness" would have failed to file a grievance. *East v. Minnehaha Cty.*, 986 F.3d 816, 821 (8th Cir. 2021) (quoting *McBride v. Lopez*, 807 F.3d 982, 988 (9th Cir. 2015)). According to the complaint, all of the other Plaintiffs filed IRRs about the attack. This shows that a fear of retaliation would not stop a "reasonable prisoner of ordinary firmness" from using the grievance process. Plaintiff Kent's and Smith's complete failure to use the grievance procedure is plain on the face of the complaint. They have failed to exhaust their remedies, and the Court must dismiss their claims.

For the foregoing reasons, the Court will deny Defendants' motion for failure to exhaust as to Plaintiffs Clemons, Stafford, Harris, Howard, and Hood, but grant Defendants' motion as to Plaintiffs Kent and Smith.

### C.    Failure to State a Claim – Individual Capacity Claims

In their motion, Defendants assert Plaintiffs fail to state a claim against Defendants McFarland, Williams, David Vandergriff, Teri Vandergriff, Raymond, Morriss, Falkenrath, Stange, and Hancock in their individual capacities. In Section A of this Order, the Court determined the individual capacity claims against Defendants Teri Vandergriff, Morriss, Falkenrath, Stange, and Hancock must be dismissed because Plaintiffs stated they only intended to sue those Defendants in their official capacities. Thus, the Court will not further address Defendants' arguments regarding Plaintiffs' alleged failure to state a claim against those Defendants. As for the remaining claims, Defendants assert the following arguments. First, they argue Plaintiff Harris fails to state a claim for deliberate indifference against Defendants McFarland and Williams for their alleged failure to provide Plaintiff Harris with functioning eyeglasses. Second, they argue Plaintiffs have failed to make any specific allegations against Defendants McFarland, Williams, David Vandergriff, or Raymond as required by § 1983. Finally, they argue Plaintiffs Holliman and Moore do not allege any specific actions Defendants Spradling, Reagan, Fenwick, or Simonton took against them.

### i.    Plaintiff Harris' Eyeglasses Claim

In their motion, Defendants argue Plaintiff Harris fails to state a claim for deliberate indifference against Defendants McFarland and Williams for their alleged failure to provide Plaintiff Harris with functioning eyeglasses. The Court agrees and will dismiss the claim.

26

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). The Eighth Amendment requires prison officials to provide humane conditions of confinement including adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official who is deliberately indifferent to providing humane conditions of confinement violates the Eighth Amendment. *Id*. To establish a claim of deliberate indifference for medical care, a plaintiff must show he "suffered from an objectively serious medical need" and the defendant "actually knew of but deliberately disregarded the need." *Santiago v. Blair*, 707 F.3d 984, 990 (8th Cir. 2013). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id*. (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)).

In the complaint, Plaintiff Harris alleges Defendants McFarland and Williams were deliberately indifferent to his medical needs when they did not provide him with eyeglasses. According to Plaintiff Harris, during a cell raid in August 2021, Defendant Fenwick broke his prescription eyeglasses. ECF No. 45, ¶ 114. He alleges he repeatedly requested new glasses from Defendants McFarland and Williams, but they ignored him. *Id*. After waiting eight months for new glasses, he received them in February 2022, but one month later, another guard broke the arms on his eyeglasses. *Id*. Plaintiff Harris alleges he has been without functional glasses since then. *Id*. at ¶ 115. He ties a string around each end to hold the glasses on his face. *Id*. When he requests replacement glasses, officers threaten to write him up for possessing contraband with his modified eyeglasses. *Id*.

These allegations do not establish Defendants were deliberately indifferent to Plaintiff Harris' medical need when they allegedly ignored his requests for eyeglasses. Courts in this district and others have concluded, as a matter of law, that the denial of eyeglasses does not constitute deliberate indifference because a denial of eyeglasses does not establish an objectively serious medical need. *Wagner v. City of St. Louis Dep't of Public Safety*, 2014 WL 3529678 at *8 (E.D. Mo. Jul. 16, 2014) (citing cases from the 7th Circuit, Eastern District of Missouri, District of Colorado, and Southern District of New York). The outcome might be different if Plaintiff Harris alleged he could not see or that his eyesight degenerated because of the refusal to provide him eyeglasses, but Plaintiff Harris has not alleged either, or how Defendants ignoring his requests otherwise damaged him. *Id*. at 9. For this reason, the Court will grant Defendants' motion as to Plaintiff Harris' claim for deliberate indifference against Defendants McFarland and Williams for their alleged failure to provide him eyeglasses.

      ii.    **Individual Capacity Claims against Defendants McFarland, Williams, David Vandergriff, and Raymond**

In their motion, Defendants argue Plaintiffs have failed to assert any specific allegations against Defendants McFarland, Williams, David Vandergriff, or Raymond as required by § 1983. For Defendant David Vandergriff, Defendants claim the only allegation against him is that he was the warden at ERDCC. For Defendants McFarland and Williams, Defendants assert the only allegations are that they were case managers at ERDCC and involved in the events on February 28, 2021. For Defendant Raymond, Defendants admit there are more allegations concerning him, but argue none of the allegations state he did anything to retaliate against Plaintiffs. For these reasons, Defendants ask the Court to dismiss any claims against these Defendants.

Individual liability in a § 1983 case is personal. *Frederick v. Motsinger*, 873 F.3d 641, 646 (8th Cir. 2017). In other words, "[g]overnment officials are personally liable only for their

own misconduct." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). To that end, a plaintiff must allege facts connecting the defendant to the challenged action. *Bitzan v. Bartruff*, 916 F.3d 716, 717 (8th Cir. 2019). "A federal complaint must contain the 'who, what, when and where' of what happened, and each defendant must be linked to a particular action." *Drummer v. Corizon Corr. Health Care*, 2016 WL 3971399, at *1 (E.D. Mo. Jul. 25, 2016). In order to state an actionable claim against each defendant, a plaintiff must set forth *specific* factual allegations showing what that particular defendant actually did, or failed to do, that violated the plaintiff's federally-protected rights. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Ellis v. Norris*, 179 F.3d 1078, 1079 (8th Cir. 1999) (a plaintiff must plead facts showing each named defendant's personal involvement in the alleged constitutional wrongdoing).

1.      Defendant David Vandergriff

In the complaint, the only allegation against Defendant David Vandergriff is in the section titled "Parties" and it states that he was the warden of ERDCC on February 28, 2021. ECF No. 45, ¶ 24. Plaintiffs argue he is ultimately responsible for the actions of his employees and the operations of his facility. However, this is not sufficient to establish a claim because "[r]espondeat superior is not applicable to § 1983 claims." *Ouzts v. Cummins*, 825 F.2d 1276, 1277 (8th Cir. 1987) (per curiam). "[A] warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement," which is required to state a § 1983 claim against an individual defendant. *Id.* Without more, Defendant David Vandergriff being the warden of ERDCC on the date of the attack is not enough to establish liability against him in his individual capacity.

Plaintiffs argue that Defendant David Vandergriff must have had knowledge and participated in the decisions concerning the attack because Defendant Raymond, ERDCC's

deputy warden on the date of the attack, was involved in the aftermath of the attack. Plaintiffs

believe they are entitled to discovery to ascertain the degree of Defendant David Vandergriff's

knowledge and involvement. To survive a motion to dismiss, Plaintiff must allege facts in the

complaint that establish a claim against Defendant David Vandergriff. They have failed to do so.

Consequently, they are not entitled to proceed to discovery on any claims against him. *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678-79, 686 (2009) ("[T]he doors of discovery" do not unlock if a

complaint does not state a plausible claim for relief.). At this time, the complaint does not

include any allegations that would entitle Plaintiffs to relief against Defendant David

Vandergriff. Therefore, the Court must dismiss any claims against him in his individual capacity.

2.      Defendants McFarland and Williams

In the complaint, the only allegations against Defendant McFarland and Williams are that

they were case managers at ERDCC on February 28, 2021, and that Plaintiff Harris asked them

for new glasses, but they ignored him. ECF No. 45, ¶¶ 32, 114. The Court has already

determined it must dismiss the claim against Defendants McFarland and Williams for their

actions regarding Plaintiff Harris' eyeglasses for failure to state a claim of deliberate

indifference. The allegation they were case managers at ERDCC on the date of the attack,

without specific allegations of misconduct, does not establish liability against them in their

individual capacities. The Court must dismiss all claims against Defendants McFarland and

Williams in their individual capacities.

3.      Defendant Raymond

Plaintiffs allege the following as to Defendant Raymond: Defendant Raymond was the

deputy warden at ERDCC on February 28, 2021. At a meeting two days after the attack, with

more than 70 Muslim prisoners, Defendant Raymond addressed the group and stated the guards'

30

actions were wrong. He claimed the guards would be punished. At this meeting, Plaintiff Kent told the group, including Defendant Raymond, what happened during the attack. Defendant Raymond assured Plaintiffs they would be allowed to pray in the wing moving forward and that their other religious requests would be accommodated. In October 2021, one week before Plaintiff Clemons was transferred to JCCC, Defendant Raymond told Plaintiffs Clemons and Stafford, "it's over now," and it was time to stop filing grievances. ECF No. 45, ¶ 25, 85, 91, 126, 154.

In their response, Plaintiffs assert that although they do not know if Defendant Raymond was directly involved in the attack, these allegations establish he "joined with the perpetrators of that attack to manage its aftermath and the various penalties inflicted on Plaintiffs." The Court disagrees. These allegations do not show Defendant Raymond participated in any actions against Plaintiffs that would establish a claim for liability. Speaking at a meeting and assuring Plaintiffs the guards would be punished, or that Plaintiffs would be allowed to pray in their wing going forward, does not establish a constitutional violation under § 1983, even if Defendant Raymond was lying when he spoke those words. The complaint does not state a claim against Defendant Raymond in his individual capacity, and the Court must dismiss these claims against Defendant Raymond.

### iii.   Plaintiffs Holliman's and Moore's Claims against Defendants Spradling, Reagan, Fenwick, and Simonton

In their motion, Defendants argue Plaintiffs do not allege Defendants Spradling, Reagan, Fenwick, or Simonton violated Plaintiff Holliman's rights in any way, or that Defendants Spradling, Reagan, or Simonton violated Plaintiff Moore's rights in any way.

For Defendant Spradling, Plaintiffs allege he was a corrections officer on duty and involved in the events of February 28, 2021. ECF No. 45, ¶¶ 28. They allege he lifted Plaintiff

31

Stafford off the ground and slammed him face down onto the concrete, and dropped all of his weight onto his knees in the middle of Plaintiff Stafford's back. *Id*. ¶ 97. They also allege Defendant Spradling slammed Plaintiff Stafford face first onto the floor when they arrived in the segregation unit. *Id*. at ¶ 101. None of these allegations concern Plaintiffs Holliman or Moore.

With respect to Defendant Reagan, Plaintiffs allege he was a corrections officer on duty and involved in the events of February 28, 2021. ECF No. 45, ¶ 29. They allege he arrived in Plaintiffs' housing unit and surrounded them along with other officers. *Id*. at ¶ 54. They allege Defendant Reagan pressed an elbow to Plaintiff Stafford's windpipe and slammed Plaintiff Stafford face first onto the floor when Plaintiff Stafford arrived in the segregation unit. *Id*. at 101. None of these allegations, besides the officers surrounding Plaintiffs, concern Plaintiffs Holliman or Moore. Surrounding prisoners, without more, cannot be the basis for liability under § 1983.

For Defendant Fenwick, Plaintiffs allege he was a corrections officer on duty and involved in the events of February 28, 2021. ECF No. 45, ¶ 30. They allege he arrived in Plaintiffs' housing unit and surrounded them along with other officers. *Id*. at ¶ 54. They further allege he deployed a long blast of pepper spray at point-blank range at Plaintiff Moore. *Id*. at 68. They allege he told Defendant Hart after Defendant Hart's pepper spray weapon no longer worked, "If that can is empty, you better throw it away." *Id*. at ¶ 99. They allege Defendant Fenwick broke Plaintiff Harris' prescription eyeglasses. *Id*. at ¶ 114. None of these allegations, besides the officers surrounding Plaintiffs, concern Plaintiff Holliman. Surrounding prisoners, without more, cannot be the basis for liability under § 1983.

As for Defendant Simonton, Plaintiffs allege he was a corrections officer on duty and involved in the events of February 28, 2021. ECF No. 45, ¶ 31. They allege he arrived in

Plaintiffs' housing unit and surrounded Plaintiffs along with other officers. *Id*. at ¶ 54. Plaintiffs allege Defendant Simonton slammed Plaintiff Stafford face first onto the floor after taking Plaintiff Stafford to segregation. *Id*. at ¶ 101. Plaintiffs allege that after asking Defendant Hart for the key to Plaintiff Stafford's handcuffs and being denied access to the key, Defendant Simonton cut off Plaintiff Stafford's jacket, t-shirt, sweatpants, shorts, and boxers while he begged them to stop. *Id*. at ¶ 103. Defendant Simonton then reached under Plaintiff Stafford's boxers and groped his genitals. *Id*.

They allege the morning after the attack, Defendant Simonton entered the segregation unit with Nurse Doe. *Id*. at ¶ 81. After Nurse Doe checked Plaintiff Harris' vitals and found that the EKG machine could barely detect a heartbeat because Plaintiff Harris was so cold and his heartrate so low, Defendant Simonton stated, "Leave him in there, he's fine." *Id*.

None of these allegations, besides the officers surrounding Plaintiffs, concern Plaintiffs Holliman or Moore. Surrounding prisoners, without more, cannot be the basis for liability under § 1983.

Because Plaintiffs have not made specific allegations showing Defendants Spradling, Reagan, Fenwick, or Simonton violated Plaintiff Holliman's rights in any way, or that Defendants Spradling, Reagan, or Simonton violated Plaintiff Moore's rights in any way, the Court must dismiss Plaintiff Holliman's claims against Defendants Spradling, Reagan, Fenwick, and Simonton, and Plaintiff Moore's claims against Defendants Spradling, Reagan, and Simonton. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Ellis v. Norris*, 179 F.3d 1078, 1079 (8th Cir. 1999) (a plaintiff must plead facts showing each named defendant's personal involvement in the alleged constitutional wrongdoing).

### D.      Battery Claims

In their motion, Defendants assert Plaintiffs' battery claims, except Plaintiff Clemons'

claims against Defendants Basham and Hart, are untimely under the Missouri statute of

limitations for actions against MDOC employees. Defendants also claim Plaintiffs do not allege

Defendant Basham battered anyone. Plaintiffs argue their claims are timely because they relate

back to the original complaint.

### i.      Statute of Limitations

Missouri Revised Statute § 516.145 states that all actions brought by an offender against

the department of corrections or its employees must be brought within one year. Missouri courts

have held that the word "all" in the statute means that no type of claim brought by an offender is

excluded from the one-year time limit. *Aldridge v. Hoskin*, 645 S.W.3d 101, 104 (Mo. Ct. App.

2022) (citing *Kinder v. Mo. Dep't of Corr.*, 43 S.W.3d 369, 373 (Mo. Ct. App. 2001)).

Plaintiffs Clemons, Stafford, and Harris filed the original complaint in this action on

January 28, 2022, against Defendants Basham, Hart, and Miller. ECF No. 1. Because Plaintiffs

were proceeding in forma pauperis, the Court ordered each Plaintiff to bring their cases

separately and struck Plaintiffs Stafford and Harris' claims from this action. ECF No. 7. On

October 11, 2022, Plaintiff Clemons filed an amended complaint against Defendants Basham and

Hart. ECF No. 15. The Court dismissed some of the claims while allowing others to proceed.

ECF No. 14. On March 2, 2023, Plaintiff Clemons filed a Second Amended Complaint adding

the current lineup of Plaintiffs and Defendants which is currently before the Court. ECF No. 28.

The Court allowed Plaintiffs to proceed together in one action because Plaintiffs vacated their in

forma pauperis status. On June 16, 2023, after being granted leave to do so, Plaintiffs filed their

Fourth Amended Complaint.[9] ECF No. 45. Plaintiffs' Second and Fourth Amended Complaints were filed more than one year after the attack which occurred on February 28, 2021. Thus, the battery claim Plaintiffs assert in their Fourth Amended Complaint is untimely.

Plaintiffs argue the claim is timely because their Fourth Amended Complaint relates back to the date of the original complaint in this matter. Rule 15(c) "governs when an amended pleading 'relates back' to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations." *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 541 (2010). Under Rule 15(c)(1), an amendment to a pleading relates back to the date of the original pleading when:

> (A) the law that provides the applicable statute of limitations allows relation back;
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out–or attempted to be set out–in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> > (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
> >
> > (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Defendants argue Plaintiffs cannot show they, except for Defendants Hart and Basham, knew or should have known of the battery claim, but for a mistake concerning the proper party's identity as required by Rule 15(c)(1)(C)(ii).

---

[9] Plaintiffs did not file a Third Amended Complaint.

A mistake as to a proper party's identity occurs if "a plaintiff knows that two or more parties exist but chooses to sue the wrong one based on a misunderstanding about that party's status or role." *Heglund v. Aitkin County*, 871 F.3d 572, 579 (8th Cir. 2017) (citing *Krupski*, 560 U.S. at 549). "Mistake implies inadvertence or a sincere but wrong belief." *Id*. Plaintiffs do not state what mistake they made in failing to include the new Defendants in the original pleadings. They assert that the attachment to the original complaint alleges claims against John/Jane Doe officers. ECF No. 53, at 21. However, a lack of knowledge of a defendant's identity is not a "mistake" under Rule 15(c). *Id*. at 580-81. Because Plaintiffs have not shown that they would have named the new Defendants except for a mistake, their battery claim against these Defendants does not relate back to the original complaint and is time-barred. For this reason, the Court must dismiss Plaintiffs' battery claim against all defendants except for Plaintiff Clemons' claim against Defendants Basham and Hart.

### ii.    Plaintiff Clemons' Battery Claim Against Defendant Basham

Defendants assert the Court must dismiss Plaintiff Clemons' battery claim against Defendant Basham for failure to state a claim because Plaintiffs do not allege Defendant Basham struck Plaintiff Clemons or anyone else.

Plaintiffs allege that on the date of the attack, Defendant Basham was the lieutenant and shift commander on duty at the ERDCC. ECF No. 45, ¶ 26. While making her rounds through the unit, she observed Plaintiffs preparing to pray and walked on as she and other guards had done hundreds of times before. *Id*. at ¶ 47. Later, she entered the housing unit and ordered that there would be no more praying in the housing unit. *Id*. at ¶ 2. She told Plaintiffs to "Stop praying now," and "There's no praying outside the chapel." *Id*. at ¶ 49. When Plaintiffs did not

36

immediately stop praying, she flew into a rage, shouting an officer in distress call into her radio and a directive to get ten beds ready in segregation. *Id*. at ¶ 51.

These allegations do not establish Defendant Basham battered anyone. To establish a claim for battery under Missouri law, a plaintiff must plead an "intended, offensive bodily contact with another person." *Devitre v. Orthopedic Ctr. of St. Louis, LLC*, 349 S.W.3d 327, 334 (Mo. 2011). "Contact with the body is offensive if it offends a reasonable sense of personal dignity." *Cooper v. Albacore Holdings, Inc.*, 204 S.W.3d 238, 246 (Mo. Ct. App. 2006) (quoting *J.D. v. M.F.*, 758 S.W.2d 177, 178 (Mo. Ct. App. 1988)). Plaintiffs do not allege Defendant Basham had bodily contact with Plaintiff Clemons. They do not allege she struck him or touched him in any way. For this reason, Plaintiff Clemons fails to state a claim for battery against Defendant Basham, and the Court must dismiss that claim.

### E.  Official Capacity Claims

In their motion, Defendants argue Plaintiffs fail to state a claim against Defendants Precythe, Sturm, Worsham, David Vandergriff, and Raymond in their official capacities. Defendants also assert Plaintiffs' claim for damages against Defendants in their official capacities is barred under the Eleventh Amendment.

#### i.  Failure to State a Claim

In the complaint, Plaintiffs allege claims against Defendants in their official capacities in Counts I, VI, and VII. Count I alleges a denial of Plaintiffs' free exercise of religion, Count VI alleges a violation of RLUIPA, and Count VII alleges a violation of the establishment clause. Defendants make two arguments in support of their assertion that Plaintiffs fail to state a claim in Counts I, VI, and VII. First, they assert Plaintiffs do not allege MDOC has a policy that Muslim prisoners cannot practice their religion or a policy that prevented Plaintiffs from exercising their

37

religious beliefs on February 28, 2021. Second, they assert Plaintiffs failed to allege these specific Defendants instituted, supervised, or are responsible for enforcing any supposed policy.

Claims against officials in their official capacity are another way of pleading an action against the entity of which the official is an agent. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id*. at 166. Liability against a governmental entity may attach if the constitutional violation "resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018); *see also Marsh v. Phelps Cty.*, 902 F.3d 745, 751 (8th Cir. 2018) (recognizing "claims challenging an unconstitutional policy or custom, or those based on a theory of inadequate training, which is an extension of the same").

"Policy" refers to "official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Corwin v. City of Independence, Mo.*, 829 F.3d 695, 700 (8th Cir. 2016). "A policy may be either a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the municipality's governing body." *Angarita v. St. Louis Cty.*, 981 F.2d 1537, 1546 (8th Cir. 1992). A plaintiff does not need to specifically plead the existence of an unconstitutional policy. *See Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004). However, at a minimum, a plaintiff must allege facts supporting the proposition that an unconstitutional policy exists. *Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003).

Plaintiffs have sufficiently alleged the existence of an unconstitutional policy to survive a motion to dismiss. Not only do Plaintiffs specifically allege in the counts listed that Defendants promulgated and maintained a policy forbidding Muslims from congregating to pray, but they

also refer to a policy and actions taken as a result of that policy. In Count I and VII of the complaint, Plaintiffs allege Defendants promulgated and maintained a policy that forbid Muslims from praying in congregation, with or without religious attire. Elsewhere in the complaint, Plaintiffs allege Defendants denied Muslim prisoners the ability to wear religious head coverings anywhere but the chapel, despite other head coverings such as the yarmulke being allowed. ECF No. 45, ¶ 117. They have also alleged that at MECC, FCC, and ACC Plaintiffs Holliman, Hood, and Kent are subject to MDOC's rule prohibiting prayer in housing unit common areas and other areas outside the chapel or cells. *Id*. at ¶¶ 119, 122, and 130. At ACC, they allege Defendants only allow Muslim prisoners chapel time once per week, but officials often suspend or cancel those services. *Id*. at 130.

Plaintiffs allege Defendants allowed Plaintiffs to congregate outside of the chapel to pray during the pandemic. Then, at some point, they decided that would no longer be permissible and pursuant to this policy, ordered Plaintiffs to stop praying on February 28, 2021, and prevented them from congregating together on future dates. These are sufficient allegations that a policy exists preventing Plaintiffs from exercising their religious beliefs.

Defendants also argue Plaintiffs failed to allege these specific Defendants instituted, supervised, or are responsible for enforcing any alleged policy. In an official-capacity suit, "a plaintiff must show that the official named in the suit took an action pursuant to an unconstitutional governmental policy . . . or that he or she possessed final authority over the subject matter at issue and used that authority in an unconstitutional manner." *Nix v. Norman*, 879 F.2d 429, 433 (8th Cir. 1989) (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986); *Williams v. Butler*, 863 F.2d 1398 (8th Cir. 1988); and *Clay v. Conlee*, 815 F.2d 1164 (8th Cir. 1987)). Plaintiffs do not

allege Defendants Precythe, Sturm, Worsham, David Vandergriff, or Raymond took any actions at all or had any authority over the alleged policy. Therefore, they fail to state a claim against these Defendants in their official capacities.

Plaintiffs allege the following as to each of these Defendants: Defendant Precythe is the Director of the MDOC. ECF No. 45, ¶ 21. Defendant Sturm is the Deputy Director of the MDOC. *Id*. at ¶ 22. Defendant Worsham is the Supervisor of Religious and Spiritual Programming for the MDOC. *Id*. at ¶ 23. Defendant David Vandergriff was the ERDCC warden on February 28, 2021. *Id*. at ¶ 24. Defendant Raymond was the deputy warden at ERDCC on February 28, 2021. *Id*. at ¶ 25. He addressed the group of Muslim prisoners two days after the attack, assured them the guards would be punished, and advised them that the Muslim prisoners could continue praying in their wing moving forward. *Id*. at ¶¶ 85, 154. He also told Plaintiffs Clemons and Stafford to stop filing grievances. *Id*. at ¶ 91. That is the entirety of the allegations against Defendants Precythe, Sturm, Worsham, David Vandergriff, and Raymond.

Nowhere in the complaint do Plaintiffs allege that these Defendants took an action pursuant to an unconstitutional governmental policy or possessed final authority over the alleged policy and used that authority in an unconstitutional manner. *Nix*, 879 F.2d at 433. For this reason, the Court must dismiss Counts I, VI, and VII against Defendants Precythe, Sturm, Worsham, David Vandergriff, and Raymond.

### ii.     Eleventh Amendment

In the final argument of their motion, Defendants assert the Court must dismiss Plaintiffs' claim for damages against official-capacity Defendants as barred under the Eleventh Amendment. Because the Court dismissed the official-capacity Defendants in the prior section, it need not address this argument.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (ECF No. 46) is **GRANTED**, in part, and **DENIED**, in part.

**IT IS FURTHER ORDERED** that Defendants Anne Precythe, Matt Sturm, Douglas Worsham, David Vandergriff, Matt Raymond, Jamie Williams, McFarland, Teri Vandergriff, Doris Falkenrath, Bill Stange, Gregory Hancock, and Kelly Morris are **DISMISSED, without prejudice**.

**IT IS FURTHER ORDERED** that Counts VI and VII are **DISMISSED**, **without prejudice**.

**IT IS FURTHER ORDERED** that Count VIII is **DISMISSED**, **with prejudice**, as to all Defendants except for Carl Hart and Michelle Basham. Count VIII is **DISMISSED**, **without prejudice**, as to Michelle Basham.

**IT IS FURTHER ORDERED** that Plaintiff Mark Holliman's claims are **DISMISSED, without prejudice,** against Defendants Dennis Spradling, Jacob Reagan, Gary Fenwick, and Adam Simonton.

**IT IS FURTHER ORDERED** that Plaintiff Montrell Moore's claims are **DISMISSED, without prejudice**, against Defendants Dennis Spradling, Jacob Reagan, and Adam Simonton.

So Ordered this 14th day of December, 2023.

_____
**STEPHEN R. WELBY**
**UNITED STATES MAGISTRATE JUDGE**