UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

REGINALD CLEMONS,
Inmate No. 990102;

STEVEN STAFFORD,
Inmate No. 365963;

WENDELL HARRIS,
Inmate No. 1272204;

MONTRELL MOORE,
Inmate No. 1215629;

PRE'MARCUS HOWARD,
Inmate No. 1353254;

MARK HOLLIMAN,
Inmate No. 501976;

VINCENT HOOD,
Inmate No. 1254167;

MANDELL KENT,
Inmate No. 339210;

MICHAEL SMITH,
Inmate No. 1227890;

     Plaintiffs,

v.

DIRECTOR ANNE L. PRECYTHE,
Missouri Department of Corrections,
in her official capacity;

Case No. 4:22-CV-158-SRW
Hon. Mag. Judge Stephen R. Welby

VERIFIED FOURTH AMENDED
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
DEMAND FOR JURY TRIAL

DEPUTY DIRECTOR Matt Sturm,
Missouri Department of Corrections,
in his official capacity;

SUPERVISOR OF RELIGIOUS and
SPIRITUAL PROGRAMMING
Douglas A. Worsham, Missouri
Department of Corrections, in his
official capacity;

WARDEN DAVID VANDERGRIFF,
Eastern Reception, Diagnostic, and
Correctional Center, in his official
and individual capacities;

DPT. WARDEN MATT RAYMOND,
Eastern Reception, Diagnostic, and
Correctional Center, in his official
and individual capacities;

LT. MICHELLE BASHAM, Shift
Supervisor, Eastern Reception,
Diagnostic, and Correctional Center,
in her individual capacity;

SGT. CARL HART, Eastern
Reception, Diagnostic, and
Correctional Center, in his individual
capacity;

OFC. DENNIS SPRADLING,
Eastern Reception, Diagnostic, and
Correctional Center, in his individual
capacity;

OFC. JACOB REAGAN, Eastern
Reception, Diagnostic, and
Correctional Center, in his individual
capacity;

2

OFC. GARY FENWICK, Eastern
Reception, Diagnostic, and
Correctional Center, in his individual
capacity;

OFC. ADAM SIMONTON, Eastern
Reception, Diagnostic, and
Correctional Center, in his individual
capacity;

WARDEN DORIS FALKENRATH,
Jefferson City Correctional Center, in
her individual capacity;

WARDEN BILL STANGE, Southeast
Correctional Center, in his individual
capacity;

WARDEN GREGORY HANCOCK,
Missouri Eastern Correctional
Center, in his individual capacity;

WARDEN TERI VANDERGRIFF,
Farmington Correctional Center, in
her individual capacity;

WARDEN KELLY MORRISS, Algoa
Correctional Center, in his individual
capacity;

     Defendants.

## VERIFIED FOURTH[1] AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

    Plaintiffs REGINALD CLEMONS, STEVEN STAFFORD, WENDELL

HARRIS, MONTRELL MOORE, PRE'MARCUS HOWARD, MARK

---

[1] Plaintiffs erroneously numbered their previous amended complaint as the fourth. As no third amended complaint was ever filed, this amendment is truly the fourth.

HOLLIMAN, VINCENT HOOD, and MANDELL KENT, by and through undersigned counsel, file this Complaint for Declaratory and Injunctive Relief against Missouri Department of Corrections ("MDOC") Director ANNE L. PRECYTHE; Missouri Department of Corrections Deputy Director MATT STURM; Missouri Department of Corrections Supervisor of Religious and Spiritual Programming DOUGLAS A. WORSHAM; Eastern Reception, Diagnostic, and Correctional Center ("ERDCC") Warden DAVID VANDERGRIFF; ERDCC Deputy Warden MATT RAYMOND; ERDCC Lieutenant MICHELLE BASHAM, Sergeant CARL HART, Officers DENNIS SPRADLING, JACOB REAGAN, GARY FENWICK, and ADAM SIMONTON Jefferson City Correctional Center ("JCCC") Warden DORIS FALKENRATH; Southeast Correctional Center ("SECC") Warden BILL STANGE; Missouri Eastern Correctional Center ("MECC") Warden GREGORY HANCOCK; Farmington Correctional Center ("FCC") Warden TERI VANDERGRIFF; and Algoa Correctional Center ("ACC") Warden KELLY MORRISS (collectively "Defendants") for violations of the First, Eighth, and Fourteenth Amendments to the United States Constitution, the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, and Missouri state law, and states as follows:

**<ins>Nature of this Action</ins>**

4

1.     With the permission of state prison guards and officials, nine Muslims gathered for prayer on the evening of February 28, 2021. They did so in their housing unit, just as they had hundreds of times in the months preceding the sadistic, violent attack that gives rise to this action.

2.     As Plaintiffs Clemons, Stafford, Harris, Moore, Howard, Hood, Holliman, Kent, and Smith stood shoulder to shoulder in prayer, out of the blue, Defendant Basham ordered that there be no more praying in the housing unit. Two plaintiffs—Kent and Smith—abruptly stopped their prayers and stepped away. The others sought to quickly finish up. Nevertheless, five were pepper sprayed and one was viciously beaten, just because they prayed.

3.     Viewing Muslims as nothing more than a gang, more than a dozen guards participated in this violent episode. The brutality began as an effort to disrupt Muslims praying together but morphed into a protracted effort to punish those who prayed—dispersing Plaintiffs throughout the state via transfers and otherwise retaliating against them.

4.     This lawsuit is an effort to hold these state officials to account for statutory and constitutional violations of Plaintiffs' rights. These Muslim incarcerees are not the prison's physical property to abuse as guards see fit, but human beings with rights that cannot be violated, though they are incarcerated.

## Jurisdiction and Venue

5.     This Court has federal question jurisdiction over Plaintiffs' claims of violations of the First, Eighth, and Fourteenth Amendments to the United States Constitution and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc, *et seq.* pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 42 U.S.C. § 1983.

6.     This Court has personal jurisdiction over Defendants because Defendants reside and conduct business in the State of Missouri.

7.     This Court has supplemental jurisdiction over Plaintiffs' claims under Missouri law pursuant to 28 U.S.C. § 1367.

8.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, 28 U.S.C. § 1343, 42 U.S.C. § 2000cc-2(a), Federal Rules of Civil Procedure 57 and 65, and by the general, legal, and equitable powers of this Court.

9.     Plaintiffs' claims for damages are authorized by 28 U.S.C. § 1343.

10.     Plaintiffs' claims for attorneys' fees and costs are authorized by 42 U.S.C. §§ 1988 and 2000cc-2(d).

11.     ERDCC,  where Plaintiffs were detained when they were pepper sprayed and thrown in seg for praying, and the various institutions where they are currently detained—namely, Jefferson City Correctional Center ("JCCC"), Farmington, Missouri Correctional Center ("Farmington"), Missouri Eastern

6

Correctional Center ("MECC"), Algoa Correctional Center ("ACC"), Southeast Correctional Center ("SECC")—are all "institution[s]" within the meaning of 42 U.S.C. § 2000cc-1(a) and 42 U.S.C. § 1997.

12.     Venue is proper under 42 U.S.C. § 1391 as to all Defendants because Defendants operate within the geographical boundaries of the State of Missouri, and the substantial part of the acts described herein occurred within this District.

## Parties

13.     Plaintiff Reginald Clemons (Inmate No. 990102) is a Muslim man who was detained at ERDCC in Bonne Terre, Missouri, on February 28, 2021. He was transferred to JCCC on October 25, 2021, where he remains. Plaintiff Clemons was, at all relevant times, a "person confined to an institution" as the term is defined in 42 U.S.C. § 2000cc, *et seq*.

14.     Plaintiff Steven Stafford (Inmate No. 365963) is a Muslim man who was detained at ERDCC in Bonne Terre, Missouri, on February 28, 2021. He remains at ERDCC. Plaintiff Stafford was, at all relevant times, a "person confined to an institution" as the term is defined in 42 U.S.C. § 2000cc, *et seq*.

15.     Plaintiff Wendell Harris (Inmate No. 12272204) is a Muslim man who was detained at ERDCC in Bonne Terre, Missouri, on February 28, 2021. He remains at ERDCC today. Plaintiff Harris was, at all relevant times, a

"person confined to an institution" as the term is defined in 42 U.S.C. § 2000cc, *et seq*.

16.     Plaintiff Montrell Moore (Inmate No. 1215629) is a Muslim man who was detained at ERDCC in Bonne Terre, Missouri, on February 28, 2021. He remains at ERDCC today. Plaintiff Moore was, at all relevant times, a "person confined to an institution" as the term is defined in 42 U.S.C. § 2000cc, *et seq*.

17.     Plaintiff Marcus Howard (Inmate No. 1353254) is a Muslim man who was detained at ERDCC in Bonne Terre, Missouri, on February 28, 2021. He was transferred to ACC on August 5, 2022, and to SECC on February 10, 2023, where he remains. Plaintiff Howard was, at all relevant times, a "person confined to an institution" as the term is defined in 42 U.S.C. § 2000cc, *et seq*.

18.     Plaintiff Mark Holliman (Inmate No. 501976) is a Muslim man who was detained at ERDCC in Bonne Terre, Missouri, on February 28, 2021. He was transferred to ACC in August 2021 where he remains. Plaintiff Holliman was, at all relevant times, a "person confined to an institution" as the term is defined in 42 U.S.C. § 2000cc, *et seq*.

19.     Plaintiff Vincent Hood (Inmate No. 1254167) is a Muslim man who was detained at ERDCC in Bonne Terre, Missouri, on February 28, 2021. He was transferred to FCC on August 10, 2022, where he remains. Plaintiff Hood

was, at all relevant times, a "person confined to an institution" as the term is defined in 42 U.S.C. § 2000cc, *et seq*.

20.    Plaintiff Michael Smith (Inmate No. 1227890) is a Muslim man who was detained at ERDCC in Bonne Terre, Missouri, on February 28, 2021, where he remains. Plaintiff Smith was, at all relevant times, a "person confined to an institution" as the term is defined in 42 U.S.C. § 2000cc, *et seq*.

21.    Defendant Anne L. Precythe is the Director of the Missouri Department of Corrections. Defendant Precythe is sued in her official capacity only. As Director, Precythe was ultimately responsible for approving and ensuring MDOC policies and procedures comport with the Constitution and federal and state law. At all times relevant to this lawsuit, Precythe had the ability, opportunity, and authority to ensure Plaintiffs had the ability to pray in congregation and were free from the risk of excessive force, discrimination, and retaliation.

22.    Defendant Matt Sturm is the Deputy Director of the Missouri Department of Corrections. Defendant Sturm is sued in his official capacity only. As Deputy Director, Sturm was responsible for approving and promulgating rules, policies, and procedures related to operations of Missouri state prison facilities, including but not limited to religious practices and accommodations policies that comport with the Constitution and federal and state law. At all times relevant to this lawsuit, Sturm had the ability,

9

opportunity, and authority to ensure Plaintiffs had the ability to pray in congregation and were free from the risk of retaliation, discrimination, and excessive force.

23.     Defendant Douglas A. Worsham is the Supervisor of Religious and Spiritual Programming for the Missouri Department of Corrections. Defendant Worsham is sued in his official capacity only. As Supervisor of Religious and Spiritual Programming, Worsham was responsible for ensuring that MDOC's religious practices and accommodations policies comported with the Constitution and federal and state law, and that MDOC facilities provided adequate accommodations for the religious practice of incarcerees. At all times relevant to this lawsuit, Worsham had the ability, opportunity, and authority to ensure Plaintiffs had the ability to pray in congregation without retaliation or discrimination.

24.     Defendant David Vandergriff was the ERDCC warden on February 28, 2021. Defendant Vandergriff is sued in his official and individual capacities. In his official capacity, the Warden was ultimately responsible for approving, promulgating, and enforcing policies and procedures at ERDCC, including but not limited to those affecting religious practice and use of force. At all times relevant to this lawsuit, the Warden had the ability, opportunity, and authority to ensure Plaintiffs had the ability to pray in congregation and were free from the risk of discrimination, retaliation, and excessive force.

10

Vandergriff also had the opportunity, ability, and authority to release Plaintiffs from seg without conduct violations. In his individual capacity, upon information and belief, the Warden made the ultimate decision to suddenly transfer Plaintiffs Clemons, Holliman, Howard, Hood, and Kent as retaliation for praying together in the first place, and for filing grievances and lawsuits regarding the attack afterward.

25.     Defendant Matt Raymond was the deputy warden at ERDCC on February 28, 2021. Raymond is sued in his official capacity. As deputy warden in charge of operations at ERDCC, Raymond was responsible for promulgating and enforcing policies and procedures at ERDCC, including but not limited to those affecting religious practice. At all times relevant to this lawsuit, Raymond had the ability, opportunity, and authority to ensure Plaintiffs had the ability to pray in congregation and were free from the risk of discrimination, retaliation, and excessive force. Raymond also had the opportunity, ability, and authority to release Plaintiffs from seg without conduct violations.

26.     Defendant Michelle Basham was the lieutenant and shift commander on duty at ERDCC on February 28, 2021, who originally disrupted Plaintiffs' prayer and initiated the call for backup that led to the attack. Defendant Basham is sued in her  individual capacity.

27.    Defendant Carl Hart was the Correctional Security Sergeant on duty at ERDCC on February 28, 2021, who disrupted Plaintiffs' prayer, led the pepper spray attack, and battered Plaintiff Stafford. Defendant Hart is sued in his individual capacity.

28.    Defendant Dennis Spradling was a corrections officer on duty and involved in the events of February 28, 2021, who disrupted Plaintiffs' prayer, participated in the pepper spray attack, and battered Plaintiff Stafford. Spradling is sued in his individual capacity.

29.    Defendant Jacob Reagan was a corrections officer on duty and involved in the events of February 28, 2021, who disrupted Plaintiffs' prayer, participated in the pepper spray attack, and battered Plaintiff Stafford. Reagan is sued in his individual capacity.

30.    Defendant Gary Fenwick was a corrections officer on duty and involved in the events of February 28, 2021, who disrupted Plaintiffs' prayer, participated in the pepper spray attack, and later broke Harris' glasses during a shakedown of his cell. Fenwick is sued in his individual capacity.

31.    Defendant Adam Simonton was a corrections officer on duty and involved in the events of February 28, 2021, who disrupted Plaintiffs' prayer, participated in the pepper spray attack, and denied Plaintiff Harris adequate medical attention following the attack. Simonton is sued in his individual capacity.

32.    Defendant Doris Falkenrath is the current warden at JCCC. Defendant Falkenrath is sued in her individual capacity only. Upon information and belief, the Warden participated in the sudden retaliatory transfer of Plaintiff Clemons, motivated by the exercise of his constitutionally protected rights to pray with other Plaintiffs in the first place, and to file grievances and lawsuits against ERDCC regarding the attack.

33.    Defendant Bill Stange is the current warden at SECC. Defendant Stange is sued in his individual capacity only. Upon information and belief, the Warden participated in the sudden retaliatory transfer of Plaintiff Howard, motivated by the exercise of his constitutionally protected rights to pray with other Plaintiffs in the first place, and to file grievances and lawsuits against ERDCC regarding the attack.

34.    Defendant Gregory Hancock is the current warden at MECC. Defendant Hancock is sued in his individual capacity only. Upon information and belief, the Warden participated in the sudden retaliatory transfer of Plaintiff Holliman, motivated by the exercise of his constitutionally protected rights to pray with other Plaintiffs in the first place, and to file grievances and lawsuits against ERDCC regarding the attack.

35.    Defendant Teri Vandergriff is the current warden at FCC. Defendant Vandergriff is sued in her individual capacity only. Upon information and belief, the Warden participated in the sudden retaliatory

transfer of Plaintiffs Kent, Hood, and Holliman, motivated by the exercise of his constitutionally protected rights to pray with other Plaintiffs in the first place, and to file grievances and lawsuits against ERDCC regarding the attack.

36.     Defendant Kelly Morriss is the current warden at ACC. Defendant Morriss is sued in his individual capacity only. Upon information and belief, the Warden participated in the sudden retaliatory transfer of Plaintiff Kent, motivated by the exercise of his constitutionally protected rights to pray with other Plaintiffs in the first place, and to file grievances and lawsuits against ERDCC regarding the attack.

## Factual Background

### Plaintiffs Adhere to Islamic Teaching Regarding Prayer

37.     Plaintiffs are Muslims and, in accordance with their religious beliefs, they offer Islam's five daily prayers—with each lasting as little as a few minutes.

38.     Plaintiffs' faith instructs them to pray in clean areas and on top of clean surfaces. When possible, Plaintiffs sought to pray in groups to secure the spiritual reward in Islam conferred on those who pray together.

39.     When praying together, a prayer leader among the group would place himself in front of everyone else standing shoulder to shoulder. As the prayer leader supplicates and recites verses from the Quran, Plaintiffs would,

in unison, bow at the waist with hands on their knees, then prostrate themselves with their forehead touching the rug, and end the prayer sitting with their legs underneath them.

### Defendants Attack While Plaintiffs are Praying

40.    On February 28, 2021, when the Muslims in the housing unit 4B "honor dorm" began their evening prayer, nothing seemed amiss. Plaintiffs finished up personal business, swept and cleaned the floor in the back of the wing, and laid out nine prayer rugs—one in front for the prayer's leader and eight in a single row behind.

41.    Video cameras at the front and back of the wing captured everything that happened next.

42.    Defendant Basham saw the men making preparations to pray as she made her rounds through the unit, but she walked on and said nothing to discourage the men from their practice. The Plaintiffs took her approval for granted, as they had prayed together in the housing unit's common space several times each day since the prison locked down their chapel in response to the COVID-19 pandemic—and, indeed, had prayed together three separate times earlier that very day.

43.    Plaintiff Stafford led the prayer in front of the other men who were shoulder-to-shoulder in a single-file row facing him: Plaintiffs Holliman, Hood, Kent, Smith, Howard, Harris, Moore, and Clemons.

15

44.     Sometime between 9:10 and 9:30 p.m., the men began praying. Shortly after they started, Defendant Basham walked into the 4B wing where Plaintiffs were praying. She had told Plaintiff Stafford to remove his *kufi* (a brimless, short, round cap worn by Muslim men) on previous occasions. So when he glimpsed Basham approaching the group, he removed his *kufi* while continuing the prayer to prevent any disturbance from Basham. Defendant Basham then announced that Plaintiffs could not pray where and how they had been praying. "Stop praying now," Defendant Basham stated. "There's no praying outside the chapel."

45.     Attempting to quickly complete the prayer, as his sincerely held religious beliefs required him to do, Plaintiff Stafford sped up the prayer in an effort to resolve Defendant Basham's concern. Other Plaintiffs followed.

46.     When Plaintiffs did not instantly cease their prayer, Defendant Basham flew into a rage, shouting an officer in distress call—code 10-5—and a directive to "get me 10 beds ready in 2 House" (one of the housing units used for segregated custody) into her radio. Code 10-5 is typically reserved for guards who are being assaulted or otherwise attacked by a group of incarcerees.

47.     At the time Defendant Basham called for back-up, Plaintiffs were praying together peacefully as they had hundreds of times previously.

16

48.    Upon hearing Defendant Basham call for back-up, Plaintiffs Kent and Smith stopped praying, stood up, and stepped away from the other plaintiffs who continued their prayer.

49.    Within moments, Defendant Carl Hart and up to 20 additional guards—Defendants Reagan, Fenwick, Simonton, and Unknown Officers 1-20—arrived and surrounded Plaintiffs. Multiple officers pointed fire-extinguisher-sized pepper spray cannisters at Plaintiffs who were praying.

50.    Plaintiffs and other incarcerees knew Defendant Hart to be volatile and violent. He was regarded as an enforcer among the guards, and a few years earlier had been removed from Ramadan meal delivery after telling some of the incarcerees that he had PTSD from having been "trained to kill Muslims in Afghanistan," objecting that he "has to feed these motherfuckers."

51.    Defendant Hart instructed officers to use violence and mace to stop Plaintiffs from praying and announced that all Plaintiffs would be placed in disciplinary segregated custody ("seg").

52.    Defendant Hart repeatedly screamed "Submit to restraints or get sprayed!" Guards filed in around the left side of the room. A few officers walked behind the Plaintiffs praying on the left side of the shoulder-to-shoulder row of praying men, ready to handcuff them and escort them away. Defendants then instructed the other incarcerees in the wing to return to their cells and lock down.

17

53.    Plaintiffs Kent and Smith, who had already stopped praying, were allowed to walk to their cells and remain there.

54.    Plaintiffs Holliman and Hood, seeing the pepper spray pointed at them, also stopped praying. They both stood and were cuffed by guards at the same time. Officers escorted Holliman, who is white—but not Hood, who is Black, like the rest of the Plaintiffs—out of range of the pepper spray attack that began moments later, saying "Let's get you out of here before you get sprayed."

55.    After Plaintiff Holliman had been escorted to safety, Defendant Hart attempted to pepper spray Plaintiff Hood, who was in restraints and being pulled away. Hart missed and almost hit the guard standing behind Hood, splattering the orange spray on the wall behind.

56.    Defendant Hart and other officers began pepper spraying Plaintiffs Howard, Harris, Moore, Clemons, and Stafford at point-blank range.

57.    Defendant Hart blasted Plaintiffs Howard, Harris, Moore, and Clemons—all of whom were peacefully praying—first across their heads then up and down their torsos, going back and forth down the line of men without taking his finger off the trigger.

58.    While other officers moved in behind the men to cuff them, Defendant Hart concentrated the spray on Plaintiff Harris, holding the pepper spray canister less than three inches from his skin and drenching the top and

back of his bowed head and shoulders. The chemical agent dripped down Harris's face, into his eyes, and down his hoodie, saturating the fabric in florescent orange liquid.

59.     As officers descended on Plaintiffs Howard, Harris, Moore, and Clemons, Defendant Hart turned his attention to Plaintiff Stafford and pepper sprayed him directly in the nose, mouth, and eyes. Stafford immediately fell to the floor in anguish, but Hart continued to saturate his head, face, and shirt.

60.     While one guard came up to cuff Plaintiff Stafford, he heard the spraying continue behind him. The officer got one cuff on and was working on the other when Defendant Hart said, "Where's the leader?" Stafford turned to see Hart standing on his right. Hart then sprayed Stafford a second time, saturating Stafford's face from one inch away. The effect was instant, filling Stafford's right ear, nose, and mouth, inflaming his lungs and triggering his asthma and chronic obstructive pulmonary disease (COPD).

61.     Plaintiff Stafford's ear was so full of pepper spray that it badly impacted his hearing. He couldn't see and could barely breathe. The pain was so intense that it felt as though Hart had poured boiling water over Stafford's face.

62.     While Defendant Hart focused on Plaintiff Stafford, Plaintiff Moore, who was still attempting to peacefully finish his prayer, stood up to a

shocking blast of pepper spray that hit the side of his face and continued down the side of his body.

63.    An officer said, "Turn around and cuff up," so Plaintiff Moore faced the wall with his hands behind his back. He looked to his right just as Defendant Fenwick deployed another long blast of pepper spray at point-blank range. Moore, overwhelmed with pain and panic, felt the chemical agent streaming into his face.

64.    Plaintiff Howard was maced as he was sitting on his knees, eyes closed, unaware of what was happening to the men around him, trying to complete his prayer. Not allowing him to do so, an officer picked Howard up under the arms and slammed him face first into the wall.

65.    Officers dragged Plaintiffs Clemons, Stafford, Harris, Moore, Howard, Holliman, and Hood toward seg, slamming them into walls and doors along the way. They proceeded through the medical bay but, despite Plaintiffs' obvious physical distress, did nothing more there than collect their names and inmate numbers. No medical evaluations, eye wash, showers, cleaning supplies, or medical advice were offered.

66.    Officers then sought to enhance Plaintiffs' pain by compelling them—most in their socks—to walk through slushy snow and mud that remained on the near-frozen baseball field rather than follow the sidewalk to the seg housing unit.

67.    Once in seg, Defendants forcibly stripped Plaintiffs Clemons, Simmonds, Moore, and Harris, down to their boxer shorts and wet, muddy socks. Only Plaintiff Holliman was allowed to remove his own clothes, and only Plaintiffs Hood and Harris—saturated in pepper spray—were allowed to keep their clothing for the long night in seg.

## ERDCC Officials Refuse to
## Provide Plaintiffs with Necessary Medical Care

68.    Apart from its designation as disciplinary segregation, 1 House is designed exactly the same as 4 House.

69.    When Plaintiffs arrived on February 28, 2021, one wing of 1 House was empty. Defendants placed each Plaintiff in a separate cell, all in a row on the bottom level of the housing unit. One officer was stationed in the central observation area of the house—known as "the bubble"—through the night.

70.    The cells in which the Plaintiffs were confined were stripped bare. Without beds or furniture, Plaintiffs were forced to sit—naked or nearly so—on the cold concrete floor with no mattresses, pillows, or blankets, or even heat.

71.    Each cell included a toilet with attached sink, but Defendants turned the water off to most cells. So Plaintiffs, covered in pepper spray, had no running water, and no way to even flush the toilet to get fresh water. Plaintiffs Moore and Harris were in such agony and torment, covered in the oil-based chemical toxins, that they were forced to use dirty toilet water to

minimally clean themselves. <u>But the splash of dirty water only made the chemical agent drip down and spread without actually cleaning any of it off.</u>

72.     For more than 15 hours, Plaintiffs Clemons, Stafford, Harris, Moore, Howard, Holliman, and Hood sat in seg with no heat, no running water, no lights, no mattresses, no blankets or pillows, and no fresh clothes.

73.     Plaintiffs Clemons, Stafford, Harris, Moore, and Howard—all of whom were soaked with pepper spray—simultaneously froze with cold and burned from the pepper spray still lingering in their eyes, noses, ears, mouths and throats. The spray triggered Plaintiff Stafford's long-diagnosed asthma and COPD causing worsening symptoms that remain to this day, and Plaintiffs Stafford and Harris sustained skin injuries that remain today. The spray has affected Plaintiff Clemons's lungs, forcing him to regularly use an inhaler.

74.     Plaintiffs repeatedly called out to guards, telling them that they were in pain and needed medical attention. But medical help did not come.

75.     The night was torture. For example, without medical care, Plaintiffs Harris and Moore attempted to wash the concentrated spray off of their heads, faces, and shoulders, succeeding only in causing the chemicals to drip all the way down their naked bodies. In the freezing dark, Harris cried out, vomited, hyperventilated, and went into shock, his entire body ablaze. While neighboring Plaintiffs called out and tried to wake him up, Harris convulsed and fell in and out of consciousness.

22

76.     Defendants Simonton and Nurse Doe entered the unit the next morning. The nurse checked Plaintiff Harris's vitals, but Harris was so cold and his heartrate was so low that even an EKG machine could barely detect a heartbeat. Defendant Simonton said, "Leave him in there, he's fine." The nurse instructed officers to bring him a blanket but provided no further treatment to Harris. The blanket Simonton brought, however, was wet and succeeded only in reintensifying the effects of the pepper spray and making him colder.

### MDOC and ERDCC Officials
### Attempt to Cover Up Their Brutality

77.     Hours after Plaintiffs' peaceful prayer was violently interrupted, around 2:00 a.m., ERDCC officials entered 1 House to inform Plaintiffs that they had each been charged with a disciplinary infraction for "acts of organized disobedience" by three or more offenders, a major conduct violation usually reserved for riot organizers. According to Defendant Hart's report included on the writeups, Plaintiffs' violation "resulted in a spontaneous use of force" including "a short burst of O/C pepper spray to the facial region of the offender."

78.     MDOC facilities network-wide treat Muslims as gang members— as a matter of policy—by assigning gang task forces to deal with incidents regarding incarcerated Muslims as they occur.

79.    On March 1, 2021, around 10 a.m., ERDCC's gang task force came into seg and told Plaintiffs they were "trying to get you guys out of here" and that Plaintiffs "didn't do anything wrong." They reported to Plaintiffs that they would take the video of the officers' assault on their prayer to Defendant David Vandergriff, the warden of ERDCC, to decide what the officers' punishment would be. After the officers left, Bennett returned and informed Plaintiffs that Defendant Stange, then captain at ERDCC, had been angry when he saw the video, reportedly saying, "They weren't doing anything but praying."

80.    Two days after the pepper spray attack, officials summoned Muslims across ERDCC to a meeting in the chapel to address the violent episode that had roiled the prison's Muslim community. More than 70 Muslim incarcerees attended. Defendant Raymond, the Associate Warden of ERDCC, addressed the group. He confirmed that the guards' actions were wrong and claimed that the guards would be punished.

81.    Each Plaintiff was called into a cursory hearing on March 9, 2021, where they were informed that their charges would be reduced to "disobeying a direct order," a minor conduct violation for which they would each be sentenced to 10 days in seg, meaning they would be released from seg the next day.

24

82.     During their hearings, Plaintiffs Clemons and Stafford made statements on the record: "I have not had access to the grievance procedure. I would like to retain the use of force video for civil litigation."

83.     Plaintiffs pleaded not guilty to all charges but were found guilty anyway, even though Plaintiffs had done nothing more than pray together on February 28, 2021, just as they had every day for months. Plaintiffs were released from seg on March 10, 2021.

## NDOC and ERDCC Officials
## Retaliate Against Plaintiffs

84.     As residents of ERDCC's honor dorm, prior to February 28, 2021, Plaintiffs were trusted, dutiful members of the prison community. They had clear prison records marked by consistent good behavior.

### *Plaintiff Reginald Clemons*

85.     Before February 28, 2021, Plaintiff Clemons had no reason to believe he would be transferred away from ERDCC. He participated in Institutional Treatment Center (ITC) programming and, as a result, was on an "ITC transfer hold" at ERDCC—that is, he was supposed to remain at ERDCC so he could continue participating in that programming. He had also been approved to begin taking classes through Ashland University in May 2021 and, accordingly, was also on an educational transfer hold.

86. Despite these two transfer holds, Plaintiff Clemons was transferred away from ERDCC to JCCC on October 25, 2021. One week prior to the transfer, Defendant Raymond, deputy warden, told Clemons and Stafford, "It's over now," and it was time to stop filing grievances. The Plaintiffs refused to stop, insisting that they wanted their conduct violations expunged and their excessive force claim meaningfully investigated. Clemons was transferred without warning just days later, and his conduct violation was expunged four days after leaving ERDCC.

87. MDOC orchestrated this sudden transfer to prevent Plaintiffs from collectively bringing this lawsuit.

88. Today, Plaintiff Clemons remains incarcerated at JCCC, where he has been denied entry to training and educational programs.

89. JCCC is three hours further away than ERDCC from Plaintiff Clemons's hometown, making it substantially more difficult for his wife and mother to visit him.

90. Shortly after Plaintiff Clemons was transferred to JCCC, the facility illegitimately blocked his wife from visiting, and she has not been allowed to visit since, despite filing applications and appeals as required.

### *Plaintiff Steven Stafford*

91. Because Stafford led the prayer, Defendants took him to be the leader of the group and, as a result, imposed sadistic punishment on him in

the aftermath of the incident. Inflicted after Stafford was fully compliant and also restrained, the sole purpose of the violence was to satisfy a desire for brutality.

92.    After Plaintiff Stafford was restrained and escorted out of the housing unit by three officers, Defendant Spradling, at Defendant Hart's direction, lifted Stafford off the ground and slammed him face down onto the concrete. Defendant Spradling then dropped all his weight onto his knees in the middle of Plaintiff Stafford's back. Officers then knelt with both knees on his legs to hold them still. One of the officers then pulled Stafford's head up from the pavement to expose his neck while Defendant Reagan pressed an elbow to his windpipe.

93.    Blind and struggling to breathe already from the effects of the pepper spray that had been sprayed down his throat moments before, Plaintiff Stafford repeatedly rasped, "Why are you doing this? I can't breathe! I can't breathe!" Defendant Hart replied, "If you're talking, you're breathing."

94.    Plaintiff Holliman heard the attack as he was being led down the sidewalk and turned around, shouting, "Hey! What are you doing? Get off of him!" Defendant Hart said, "You should have thought about that before you started praying!" and he attempted to spray Plaintiff Stafford again with his large pepper spray weapon. Finding the cannister empty from the earlier

attack, Defendant Fenwick said, "If that can is empty, you better throw it away."

95.    Officers then shackled Plaintiff Stafford's ankles, picked him up, and dragged him to seg.

96.    When they arrived in seg, Defendants Simonton, Reagan, Spradling, and Hart again slammed Plaintiff Stafford face first onto the floor. Officers beat and kicked Stafford as he cried, "Why are you doing this to me? I'm not fighting!"

97.    Defendant Simonton asked Defendant Hart for the key to Plaintiff Stafford's cuffs so they could remove his pepper spray saturated clothing. Defendant Hart said, "No, cut it off. Fuck him."

98.    While the other officers watched, Defendant Simonton cut off Plaintiff Stafford's jacket, t-shirt, sweatpants, shorts, and boxers while he begged them to stop. As a means of intimidation and humiliation, Defendant Simonton reached under Plaintiff Stafford's boxers and groped his genitals as he cut the garment into pieces. As intended, Plaintiff Stafford was frozen in fear of what might happen next. He couldn't breathe, and he felt like throwing up.

99.    As soon as Plaintiff Stafford's clothes were cut beyond repair and removed, leaving him naked and vulnerable on the floor, Defendant Hart

28

produced the handcuff key from his pocket and laughed, removing the restraints on his way out the door.

100.    Around half an hour after the assault, a guard brought Plaintiff Stafford a new pair of boxer shorts. He put them on and within 10 seconds felt intense burning in his genitals. He removed the boxers to find a familiar bright orange line of OC liquid deliberately sprayed in the crotch of his underwear, from genitals to anus.

101.    Plaintiff Stafford was denied medical treatment for weeks following the incident despite repeatedly requesting it. For two years, Stafford has suffered the effects of severe PTSD and aggravated asthma which remain unchecked and untreated despite his requests.

102.    After he returned from seg and resumed his job, Defendants imposed special strip search requirements on Stafford as a kind of demeaning, irregular punishment. At Defendant Hart's direction, officers subjected Stafford to humiliating strip searches before he could go into the kitchen to work during the month of Ramadan. No other kitchen workers were subjected to the searches, and Stafford had never been subjected to them before.

103.    Around one month after his release from seg, Plaintiff Stafford was fired from his $40 per month kitchen job with no documentation or evidence of wrongdoing as a further retaliation for leading Muslims in peaceful prayer as

guards had allowed them to do hundreds of times before February 28, 2021's violent turn.

### *Plaintiff Wendell Harris*

104.    After Plaintiff Harris nearly died from the pepper spray that sent him into shock and convulsions in seg, ERDCC officials turned his life into a living hell. Officers have written Plaintiff Harris up on so many conduct violations that he has spent more than 12 of the last 24 months in seg.

105.    Seg at ERDCC subjects Plaintiff Harris to isolation in a cell, usually alone (though he once had a roommate for a time) and in lockdown for 23 hours per day. Defendants place his personal property in storage, which usually gets lost, leaving him with nothing except two outfits and writing implements. While in seg, Plaintiff Harris is denied access to his paperwork and to the grievance process. He is permitted to write to his parents or send kites to his case manager (which are always ignored). He is not allowed to communicate with anyone else. He is also subjected to random, humiliating strip searches without warning.

106.    The numerous write-ups have also caused his security level to rise. As a result of his elevated security level, Harris is not allowed to attend classes, work, or participate in other programs. The new security level may impact his release date.

107.    In March 2021, Defendants transferred Harris out of the honor dorm after a write-up. As Defendants moved Harris to and from segregation, they raided his cell frequently in order to identify conduct violations that could become the basis for additional punishment.

108.    Defendants first moved Plaintiff Harris, a black man, into a known white supremacist unit. In general population, cut off from other Muslims and his faith, Plaintiff Harris was harassed and tormented by white supremacists. One eventually attacked him, and the altercation that ensued landed Harris back in isolation for eight months.

109.    During one cell raid in or around August 2021, Defendant Fenwick broke Plaintiff Harris's prescription eyeglasses. Harris repeatedly messaged Defendant Case Workers Williams and McFarland requesting new glasses, but they ignored him. He waited eight months for new glasses, only to have the arms broken off by another guard one month after getting them in February 2022.

110.    Plaintiff Harris has been without functional glasses—again—since February 2022. Harris has tied a string around each end of his broken lenses to hold them on his face in a desperate attempt to see. When he requests replacement glasses, officers threaten to write Harris up for possessing contraband—that is, his modified eyeglasses. Harris is afraid to push the issue for fear he will lose even this inadequate pair of glasses.

111.    For months when he had no functional glasses at all, Plaintiff Harris experienced headaches, nausea, dizziness, and worsening eyesight. Because his vision was so poor without his glasses, he could not avoid or protect himself from incarcerees who targeted and beat him because he could not analyze or see threats from a distance. Even his improvised glasses are not sufficient when they often slip out of place and render Harris sightless again, causing continually worsening headaches and anxiety due to his inability to perceive threats before they attack.

112.    The February 28, 2021, attack and subsequent, relentless retaliation have left Plaintiff Harris feeling despondent, constantly fearful, and hopeless.

### *Plaintiff Montrell Moore*

113.    Though he remains at ERDCC, Moore and other Muslims have been denied the ability to wear religious head coverings—*kufis*—anywhere but the chapel, despite the fact that other head coverings such as yarmulke and beanies may be worn throughout the facility. Likewise, Muslim prayer rugs, beads, prayer oil, and other religious items cannot be purchased at all. The reason: because others may purchase and wear them to designate gang affiliation. MDOC designates Muslims as gang members by policy which creates a baseline of discrimination and retaliation for Muslim incarcerees generally and Plaintiffs specifically.

32

### *Plaintiff Mark Holliman*

114.   Holliman was transferred to Missouri Eastern Correctional Center ("MECC") in Pacific, Missouri, in August 2021, two weeks after filing offender grievances against ERDCC's attack and subsequent retaliation.

115.   At MECC, Holliman is subject to MDOC's rule prohibiting prayer in housing unit common areas and other spaces outside the chapel or cells. Despite this rule, MDOC officials have allowed Christians to hold prayer circles in the yard and other areas. And one particular housing unit is set aside for participants of a counseling program that features daily, Christian prayer and bible study in the wing.

116.   MECC allows Christians to congregate for prayer in a way it does not allow Muslims.

### *Plaintiff Vincent Hood*

117.   Plaintiff Hood was transferred to FCC on August 10, 2021, by request.

118.   At Farmington, Plaintiff Hood is subject to MDOC's rule prohibiting prayer in housing units and other spaces outside the chapel or cells. Despite this rule, Farmington officials allow Christians to gather for prayer in places and at times Muslims are not allowed to do the same.

***119.***   During Ramadan, Islam's holy month, Plaintiff Hood and other Muslims are only allowed to make daily prayers together in the chow hall,

33

which is overrun with filth, roaches, and rats. Not only does the filth desecrate Hood's prayers, but the chow hall is not large enough to accommodate all Muslims who wish to pray during Ramadan.

### *Plaintiff Mandell Kent*

120.    Plaintiff Kent was transferred to Farmington in 2021 before ultimately being transferred to ACC in September 2022.

121.    The day after the attack, Defendants raided Plaintiff Kent's cell, taking the shirt and shoes he had been wearing the night before. Defendants began raiding Kent's cell almost weekly after that in an effort to intimidate and harass him, even though he left the prayer group before the guards had pepper sprayed anyone.

122.    Two days after the attack, at the campuswide gathering of Muslims, Plaintiff Kent told the group, including guards and Defendant Raymond, what had truly happened during the attack.

123.    Shortly thereafter, Defendants suddenly and without warning pulled Plaintiff Kent from his activity in the yard and transferred him to the reception side of the facility, separating him completely from other Plaintiffs. On May 21, 2021, Defendants transferred Kent to FCC.

124.    Plaintiff Kent did not receive any conduct violations or time in the hole resulting from the February 28, 2021 attack. But officials at Farmington still brought Kent in for questioning regarding the incident when he arrived.

125.    Now at ACC, Plaintiff Kent has been denied his applications for residence in the honor dorm despite having a clean prison record with no conduct violations since 2016. And as seems to be the policy across MDOC, ACC assigned the gang task force to deal with all events related to Muslim incarcerees.

126.    Officials at ACC also use MDOC's policy prohibiting "public" prayer to deny Muslim incarcerees any opportunity to pray together. Not only are they afforded chapel time just once per week, but ACC officials use any excuse to suspend or cancel those services. In the past two months, Kent and other Muslims have been allowed to hold their weekly *Jumu'ah* service only three times.

### *Plaintiff Michael Smith*

127.    Defendants denied Plaintiff Smith access to the grievance process in the days following the February 28, 2021, attack. After the other Plaintiffs went to seg, Smith requested IRR forms from his case worker—the standard protocol for beginning the grievance process. The case worker refused and told Smith he would have to wait two weeks to get the forms. Defendants never provided them.

### Plaintiffs Have Exhausted
### All Administrative Remedies

128.    ERDCC incarcerees may appeal any disciplinary action taken by officials against them according to the terms of the facility's three-step Offender Grievance Procedure.

129.    At the Procedure's first step, the incarceree must submit an Informal Resolution Request (IRR). IRRs must be filed within 15 calendar days of the incident in question, and incarcerees must receive a response within 40 calendar days of the receipt of their IRR.

130.    Second, if incarcerees have not received a response within 40 calendar days, or if the IRR remedy is denied or otherwise unresolved during that time, they may notify grievance staff and request an Offender Grievance form. That form must be filed within 7 calendar days from the date that the incarceree signs the IRR response. Incarcerees are to receive a response within 40 calendar days of filing an Offender Grievance.

131.    Third, if incarcerees have not received a response to their Offender Grievance within 40 calendar days, or if the grievance remedy is denied or otherwise unresolved during that time, they may file a Grievance Appeal. A Grievance Appeal must be filed within 7 calendar days from the date that the incarceree signs the Offender Grievance Response. An Appeal Response must be given within 100 calendar days from the date that it is received. After submitting the Grievance Appeal, the grievance procedure is exhausted.

132.    On or around March 9, 2021, Defendants found the seven Plaintiffs who were pepper sprayed and detained guilty of disobeying a direct order during the incident and sentenced them to 10 days of disciplinary segregation, which they completed the following day, having been in seg since February 28.

133.    On March 15, 2021, Plaintiff Clemons filed an IRR regarding the attack and conduct violation. On or around June 23, 2021, Defendants issued a denial. On July 12, 2021, Plaintiff Clemons filed an Offender Grievance. On October 29, 2021, he received a response to that grievance, which stated that the violation had been dismissed and expunged from Clemons's record but did not address the requested preservation of video evidence of the attack.

134.    On March 15, 2021, Plaintiff Clemons filed another IRR regarding the attack. On or around June 23, 2021, Defendants issued a denial.

135.    On March 25, 2021, Plaintiff Clemons filed an IRR to report that Defendants violated his religious rights by threatening to pepper spray him again if he was caught praying in the common area of the housing unit again. Defendants issued a denial on or around June 23, 2021. On July 12, 2021, Plaintiff Clemons filed an Offender Grievance. And on October 29, 2021, Defendants issued a denial.

136.    On April 16 2021, Plaintiff Clemons filed an IRR to report retaliatory harassment from Defendants Basham and Hart.

137.    On May 24, 2021, Plaintiff Clemons again filed an IRR regarding the attack, asserting that the matter had not been resolved and requesting review of the facility's surveillance video. The IRR response stated that the request was submitted for investigation and should be resolved. On August 23, 2021, Plaintiff Clemons filed an Offender Grievance inquiring about the investigation. On October 27, 2021, Defendants issued a denial.

138.    On August 09, 2021, Plaintiff Clemons filed an IRR asking to escalate all previous complaints to the next level. Defendants issued a response stating that Clemons's IRRs had been moved to the next stage.

139.    On November 15, 2021, Plaintiff Clemons filed an offender grievance claiming that he was denied a redress of grievances as a form of administrative retaliation and requesting escalated review of his previous complaints. On December 12, 2021, Defendants issued a response stating that all previous complaints had been escalated to the grievance or appeal stage.

140.    On March 12, 2021, Plaintiff Stafford filed an IRR regarding his personal clothing items were cut off him and destroyed during the assault on February 28, 2021. In or around May 2021, Defendants issued a response denying his IRR. On May 20, 2021, Plaintiff Stafford filed an offender grievance. Defendants issued a response on November 09, 2021, again denying the grievance. Plaintiff Stafford issued three appeals: on October 13, 2021, January 12, 2022, and February 16, 2022. Defendants denied them all.

141.    On March 16, 2021, Plaintiff Stafford filed an IRR regarding assault against him on February 28, 2021. After receiving no response within the allotted 40 days, on May 20, 2021, Plaintiff Stafford filed an offender grievance. On October 13, 2021, Defendants issued a response denying the grievance. On the same day, Stafford filed a grievance appeal. On November 9, 2021, Defendants issued a response again denying any relief.

142.    On May 03, 2021, Plaintiff Stafford filed an IRR regarding retaliatory firing from his kitchen job on May 01, 2021. On August 19, 2021, Stafford filed an offender grievance demanding written documentation of the basis for his termination. On October 07, 2021, Defendants issued a response deeming the matter resolved.  On February 16, 2022, Plaintiff Stafford filed a grievance appeal. On February 18, 2022, Defendants issued a response stating that the matter was resolved. On March 14, 2022, Defendants issued another similar response.

143.    On September 28, 2021, Plaintiff Stafford filed an IRR asking that three IRRs that had been pending for over 100 days needed to be moved forward. Defendants issued a response saying that the grievance appeal forms had been issued and therefore the IRR was resolved.

144.    On November 09, 2021, Plaintiff Stafford filed an IRR requesting to purchase a prayer rug from a vendor. Defendants denied the request saying,

"According to several Islamic experts, prayer rugs are not a requirement for prayer, it is only required that prayers be performed in an area that is clean."

145.    On or around March 15, 2021, Plaintiff Harris filed an IRR requesting an investigation of the pepper spray incident and expungement of the resulting conduct violation. Shortly thereafter, Plaintiff Harris was sent to seg where he has lived on and off for months at a time since February 28, 2021. Each time he is sent to seg, Defendants deny him access to his personal paperwork and to the grievance procedure including even basic forms required to file IRRs and grievances. Plaintiff Harris is unsure if Defendants ever responded to his IRR, but as Defendants have denied him access to the grievance procedure, his administrative remedies are exhausted.

146.    On or around March 12, 2021, Plaintiff Moore filed an IRR regarding the attack. Around six months later, having received no response, Plaintiff Moore filed an offender grievance. In or around February 2022, one year after Plaintiff Moore filed the IRR, Defendants issued a response, bearing no signatures or official stamps, denying his grievance. Plaintiff Moore filed a grievance appeal the same day, and Defendants responded denying his appeal. Plaintiff Moore does not know if his conduct violation was ever dismissed or expunged. Plaintiff Moore's grievance procedure is exhausted.

147.    On or around March 15, 2021, Plaintiff Howard filed an IRR regarding the attack and related conduct violation. Receiving no response,

Howard filed an offender grievance on or around December 22, 2021. Since that time, MDOC transferred him to two different facilities where he was denied access to the grievance appeal procedure. Because Defendants have blocked Howard's access to the grievance procedure, his obligation is exhausted.

148.    On or around March 15, 2021, Plaintiff Hood filed an IRR regarding the attack and conduct violation. In or around August 2021, Plaintiff Hood filed an offender grievance after receiving no response. In or around November 2021, Defendants responded that the conduct violation had been dismissed and expunged but denied any further relief. Shortly thereafter, Plaintiff Hood was sent to seg on an unrelated matter and was denied access to the grievance appeal procedure. His grievance procedure is therefore deemed exhausted.

149.    On or around March 12, 2021, Plaintiff Holliman filed an IRR regarding the attack and conduct violation. Defendants issued a response on or around August 1, 2021, denying the IRR. Plaintiff Holliman immediately filed an offender grievance. In or around February 2022, Defendants responded denying the grievance. Plaintiff Holliman immediately filed a grievance appeal, but Defendants have failed to respond in the year since. Plaintiff Holliman's grievance appeal is therefore deemed denied, and his grievance procedure is exhausted.

150.    Plaintiff Kent filed an IRR reporting the violation of his rights on or around March 15, 2021. He does not remember if he received a response and filed a grievance by the time he was transferred to Farmington on May 21, 2021, but his access to ERDCC's grievance system was cut off at that point.

151.    Smith did not file an IRR or offender grievance immediately following the attack, but he did file two years later at which time he exhausted the grievance procedure at ERDCC..

## Count I

### VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT
### (Jurisdiction Under 42 U.S.C. § 1983)
### (Free Exercise)
### (Damages Against Individual Capacity Defendants (excluding Falkenrath, Stange, Hancock, T. Vandergriff, and Morriss) and Injunctive Relief Against Official Capacity Defendants)

152.    Plaintiffs repeat and re-allege the foregoing paragraphs, as though fully set forth herein.

153.    42 U.S.C. § 1983 provides a cause of action against every person who, under color of law, deprives a person of their rights secured by the Constitution or federal law.

154.    Under the First Amendment, as incorporated against the states by the Fourteenth Amendment, Plaintiffs have the right to freely practice their religion.

155.    The First Amendment protects Plaintiffs against state action that substantially burdens their ability to practice their religion in accordance with their sincerely held beliefs.

156.    By promulgating and maintaining a policy that forbids Muslims from praying in congregation, Defendants prevent Muslim incarcerees from gathering for an Islamic purpose while they allow other incarcerees to gather for Christian or secular purposes.

157.    By assaulting and pepper spraying Plaintiffs while they prayed, confining them to seg after the attack, denying them necessary medical care, and retaliating against them in myriad ways described above, Defendants have substantially inhibited and constrained conduct and expression that manifests central tenets of Plaintiffs' individual religious beliefs. In the same way, Defendants have also meaningfully curtailed Plaintiffs' express adherence to their faith, denied them reasonable opportunities to engage in activities fundamental to their religion, and retaliated against them for their constitutionally-protected religious exercise.

158.    Plaintiffs respectfully request this Court to enter a judgment in their favor, and against the Individual Capacity Defendants, for damages in whatever amount Plaintiffs are found to be entitled; costs and attorneys' fees wrongfully incurred to bring this action; and any

43

other damages, including punitive damages, as provided by applicable law. Plaintiffs also respectfully request this Court to enter a judgment in their favor, and against the Official Capacity Defendants, for preliminary injunctive relief followed by a permanent injunction relating to the terms outlined in the Prayer for Relief, below..

## Count II

**VIOLATION OF THE EIGHTH AMENDMENT**
**(Jurisdiction Under 42 U.S.C. § 1983)**
**(Use of Force)**
**(Plaintiffs Clemons, Stafford, Harris, Moore, Howard, Hood, and Holliman Against Individual Capacity Defendants (excluding Falkenrath, Stange, Hancock, T. Vandergriff, and Morriss))**

159.     Plaintiffs repeat and re-allege the foregoing paragraphs, as though fully set forth herein.

160.     42 U.S.C. § 1983 provides a cause of action against every person who, under color of law, deprives a person of their rights secured by the Constitution or federal law.

161.     Under the Eighth Amendment, as incorporated against the states by the Fourteenth Amendment, Plaintiffs have the right to be free of cruel and unusual punishment, including the unnecessary and wanton infliction of pain by prison officials against them.

162.     By assaulting and pepper spraying Plaintiffs while they prayed, Defendants used force maliciously and sadistically, with the intent to

cause harm. Defendants' use of force was not deployed in good faith and was not related to any attempt to maintain or restore discipline.

163.    Defendants also used force maliciously and sadistically when they choked, beat, and sexually assaulted Plaintiff Stafford, and when they provided him with boxer shorts that had been doused with pepper spray.

164.    Plaintiffs respectfully request this Court to enter a judgment in their favor, and against the Individual Capacity Defendants, for damages in whatever amount Plaintiffs are found to be entitled; costs and attorneys' fees wrongfully incurred to bring this action; and any other damages, including punitive damages, as provided by applicable law.

## Count III

### VIOLATION OF THE FIRST AMENDMENT
**(Jurisdiction Under 42 U.S.C. § 1983)**
**(Retaliation)**
**(Plaintiffs Clemons, Stafford, Harris, Howard, Hood, Holliman, and Kent Against D. Vandergriff, Falkenrath, Stange, Hancock, T. Vandergriff, and Morriss in their Individual Capacities)**

165.    Plaintiffs repeat and re-allege the foregoing paragraphs, as though fully set forth herein.

166.    42 U.S.C. § 1983 provides a cause of action against every person who, under color of law, deprives a person of their rights secured by the Constitution or federal law.

45

167.    Under the First Amendment, as incorporated against the states by the Fourteenth Amendment, Plaintiffs have the right to be free from retaliation for exercising Constitutionally-protected rights including free speech and seeking redress of government.

168.    Defendants suddenly and unceremoniously transferred Plaintiffs Clemons, Holliman, Hood, Howard, and Kent all because they filed grievances and/or lawsuits against officers involved in their attack on February 28, 2021.

169.    By transferring Plaintiffs in response to their grievances and/or lawsuits, Defendants violated the First Amendment. The sudden transfers forced Plaintiffs to leave jobs, training and educational programs, and friends, not to mention move hours away from family, making visitation rare or nonexistent.

170.    Though they did not transfer other Plaintiffs, Defendants punished Plaintiff Stafford by harassing and firing him from his kitchen job, and Plaintiff Harris by giving him one bogus disciplinary violation after another, keeping him in seg for the better part of two years, all because they filed grievances and/or lawsuits against officers involved in their attack on February 28, 2021.

171.    Plaintiffs respectfully request this Court to enter a judgment in their favor, and against the Individual Capacity Defendants, for

46

damages in whatever amount Plaintiffs are found to be entitled; costs and attorneys' fees wrongfully incurred to bring this action; and any other damages, including punitive damages, as provided by applicable law.

## Count IV

### VIOLATION OF THE EIGHTH AMENDMENT
**(Jurisdiction Under 42 U.S.C. § 1983)**
**(Deliberate Indifference)**
**(Plaintiffs Clemons, Stafford, Harris, Moore, and Howard Against Individual Capacity Defendants)**

172. Plaintiffs repeat and re-allege the foregoing paragraphs, as though fully set forth herein.173. 42 U.S.C. § 1983 provides a cause of action against every person who, under color of law, deprives a person of their rights secured by the Constitution or federal law.174. Under the Eighth Amendment, as incorporated against the states by the Fourteenth Amendment, Plaintiffs have the right to be free of cruel and unusual punishment, including prison officials' deliberate indifference to their serious medical needs.175. By leaving Plaintiffs in seg after dousing them in pepper spray and ignoring their repeated pleas for medical assistance, and still not providing them with any medical care for associated injuries—or even soap and water to stop the burning—Defendants consciously disregarded their known and objectively serious medical needs.176. Plaintiffs respectfully request this Court to enter a judgment in their favor,

and against the Individual Capacity Defendants, for damages in whatever amount Plaintiffs are found to be entitled; costs and attorneys' fees wrongfully incurred to bring this action; and any other damages, including punitive damages, as provided by applicable law.

## Count V

### VIOLATION OF THE FOURTEENTH AMENDMENT
### (Equal Protection)
### (Injunctive and Declaratory Relief Against Official Capacity Defendants; Monetary Relief Against Individual Capacity Defendants (excluding Falkenrath, Stange, Hancock, T. Vandergriff, and Morriss))

177.    Plaintiffs repeat and re-allege the foregoing paragraphs, as though fully set forth herein.

178.    42 U.S.C. § 1983 provides a cause of action against every person who, under color of law, deprives a person of their rights secured by the Constitution or federal law.

179.    Under the Equal Protection Clause of the Fourteenth Amendment, Plaintiffs have the right not to be discriminated against by government officials on the basis of their race or religion.

180.    By treating Plaintiff Holliman more favorably than the other Plaintiffs because he is white, Defendants discriminated against the other Plaintiffs on the basis of race.

181.    By allowing non-religious groups to gather for classes, games, and other activities, and allowing Christian groups to gather for prayer scriptural study in housing units and other common spaces, all while preventing and retaliating against Plaintiffs for doing the same, Defendants continue to discriminate against all Plaintiffs on the basis of religion.

182.    Plaintiffs respectfully request this Court to enter a judgment in their favor, and against the Individual Capacity Defendants, for damages in whatever amount Plaintiffs are found to be entitled; costs and attorneys' fees wrongfully incurred to bring this action; and any other damages, including punitive damages, as provided by applicable law. Plaintiffs also respectfully request this Court to enter a judgment in their favor, and against the Official Capacity Defendants, for preliminary injunctive relief followed by a permanent injunction relating to the terms outlined in the Prayer for Relief, below.

## Count VI

### VIOLATION OF THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT
### (Free Exercise)
### (Against Official Capacity Defendants Only)

183.    Plaintiffs repeat and re-allege the foregoing paragraphs, as though fully set forth herein.

49

184.    The Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc(a) *et seq.*, forbids Defendants from imposing a substantial burden on Plaintiffs' religious exercise unless that burden is the least restrictive means of furthering a compelling governmental interest.

185.    By promulgating and maintaining a policy that forbids Muslims from praying in congregation on a daily basis, Defendants have substantially inhibited and constrained conduct and expression that manifests Plaintiffs' individual sincerely held religious beliefs, meaningfully curtailed their express adherence to their faith, denied them reasonable opportunities to engage in activities fundamental to their religion, and retaliated against them for their constitutionally-protected religious exercise.

186.    Plaintiffs respectfully request this Court to enter a judgment in their favor, and against the Official Capacity Defendants, for injunctive relief; costs and attorneys' fees wrongfully incurred to bring this action; and any other damages, including punitive damages, as provided by applicable law. Plaintiffs also respectfully request this Court to enter a judgment in their favor, and against the Official Capacity Defendants, for preliminary injunctive relief followed by a permanent injunction relating to the terms outlined in the Prayer for Relief, below.

50

## Count VII

**VIOLATION OF MISSOURI TORT LAW**
**(Battery)**
**(Clemons, Harris, Moore, Howard, Hood vs. Hart; Stafford vs. Hart, Spradling, Reagan, Simonton; Harris, Moore vs. Fenwick; Harris vs. Simonton)[2]**

187.    Plaintiffs repeat and re-allege the foregoing paragraphs, as though fully set forth herein.

188.    A defendant is subject to liability for battery if he intends to, and actually does, cause a harmful or offensive contact with the person of another.

189.    Defendants intentionally attacked and pepper sprayed Plaintiffs as they prayed, thereby committing battery.

190.    Defendants beat, choked, and sexually assaulted Plaintiff Stafford, thereby committing battery.

191.    Plaintiffs respectfully request this Court to enter a judgment in their favor, and against the Individual Capacity Defendants, for damages in whatever amount Plaintiffs are found to be entitled; costs and attorneys' fees wrongfully incurred to bring this action; and any other damages, including punitive damages, as provided by applicable law.

---

[2] The Court dismissed battery claims for all parties apart from Clemons v. Hart. Dkt. 67. Plaintiffs retain these claims for the purpose of appeal.

## **Prayer for Relief**

WHEREFORE, Plaintiffs request that this Honorable Court enter judgment in their favor and against Defendants on each and every count in this Complaint, and enter an order awarding all appropriate damages to Plaintiffs and injunctive relief adequate to remedy the statutory and constitutional violations. Requested injunctive relief includes:

1. MDOC-wide policy change mandating that all facilities provide Muslim incarcerees congregational Jummah services mid-day each Friday, which are currently being denied or often canceled;

2. MDOC-wide policy change mandating that Muslim incarcerees be provided Taleem (religious group study) for one hour each week; and

3. MDOC-wide policy change mandating that Muslim incarcerees be allowed to gather and pray in their housing units, during any of their five required prayer times each day, whether in the common areas or in a separate space.

Plaintiffs also request attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988, and that the Court order any further relief the Court may deem just and proper.

## **JURY DEMAND**

NOW COME Plaintiffs, by and through their undersigned counsel, and hereby demand a jury trial of the above-referenced causes of action so triable.

Dated: October 3, 2024  Respectfully Submitted,

**CAIR LEGAL DEFENSE FUND**

Lena F. Masri (VA 93291)

lmasri@cair.com

Gadeir I. Abbas (VA 81161)*

gabbas@cair.com

Justin Sadowsky (VA 73382)

jsadowsky@cair.com

Kimberly Noe-Lehenbauer (OK 34744)**

knoelehenbauer@cair.com

453 New Jersey Ave., S.E.

Washington, DC 20003

Phone: (202) 742-6420

Fax: (202) 488-0833

*Mr. Abbas licensed in VA, not in D.C. Practice limited to federal matters.*

**Ms. Noe-Lehenbauer licensed in OK, not in D.C. Practice limited to federal matters.*