UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| REGINALD BYRON CLEMONS, et al., ) ) ) Plaintiffs, ) ) v. ) ) MICHELLE BASHAM, et al., ) ) Defendants. ) | Case No. 4:22-CV-00158-SRW |

**DEFENDANTS' TRIAL BRIEF**

Defendants Trevor Foley, Travis Terry, Valarie Moseley, Aaron Davis, Richard Adams, Jennifer Shankle, Kelly Morris, Gregory Hancock, Patricia Wickey, Teri Vandergriff, Craig Crane, David Vandergriff, Matt Raymond, Michelle Basham, Carl Hart, Dennis Spradling, Jacob Regan, Gary Fenwick, and Adam Simonton, by and through undersigned counsel, provide their trial brief.

**Factual Background**

Plaintiffs are nine Muslim men who were incarcerated in the Missouri Department of Corrections ("MDOC") Eastern Reception, Diagnostic, and Correctional Center ("ERDCC") on February 28, 2021. Defendants are all current or former MDOC employees. Defendants can be characterized in two groups: "Official Capacity Defendants", who currently oversee MDOC operations and the prisons where Plaintiffs are currently housed, and "Individual Capacity Defendants", including those who worked at ERDCC on February 28, 2021, and those who ran the prisons where the Plaintiffs were transferred after February 28, 2021.

1

**The Policy**

MDOC's Religious or Spiritual Programming policy, IS17-1.1, provides "guidelines for the administration and management of religious or spiritual programming reflective of department religious accommodations and prescribed religious practices." IS17-1.1, I.C. Under this policy, "[a]ll meetings and activities of a religious or spiritual nature shall be scheduled through the chaplain and shall be held in the chapel or other designated areas under the control and supervision of the chaplain or designee." *Id.* at III.A.3. This rule, however, provides an exception for individual practice where "[o]ffenders may individually engage in private religious practice in their living quarters unless the practice poses a threat to the safety and security of the institution." *Id.* at III.A.4.

The policy distinguishes between fully accommodated groups and solitary practice groups. The former consists of religious groups who have at least five members at a given institution, and who get approval from the chaplain to use the chapel. Al-Islam, Plaintiff's religious group, is a fully accommodated group within ERDCC.

Each fully accommodated group receives two group services per week, not including denominational services and topical studies. *Id.* at III.B.2.a. One of these services is designated as the "primary" service, for which practicing offenders are excused from other required activities to attend. *Id.*

ERDCC is a Level 5 institution (colloquially referred to as "maximum security") with controlled movement, meaning that offenders must be accounted for

2

at all times. Accordingly, per ERDCC's Standard Operating Procedure for the policy (ERDCC-SOP17-1.1), offenders must sign up for chapel services in advance of the service to be placed on the "call-out list," which tells staff where inmates need to be transferred within the institution and when.

In addition to the two weekly services for fully accommodated religious groups, an offender can request accommodation from the chaplain for "religious activities or needs which are not available at the institution," including religious activities deemed essential to the practice of the offender's faith. IS17-1.1, III.J.1.a. These requests are made in writing to the chaplain, and they initiate a multi-stage review process to determine the ability of the institution to accommodate the request. *Id.* at III.J.2.a-i. Plaintiffs did not submit such a request to the ERDCC chaplain in advance of their prayer gathering giving rise to this action.

**February 28, 2021**

There are four "wings" in each housing unit of ERDCC, each with its own common area (sometime referred to as a "day room"), located in the middle of two stories of cells. On February 28, 2021, at about 9:41 p.m., Plaintiffs gathered in the common area of their wing to pray. The nine men engaged in their prayer, which involves lining up together in close ranks behind the prayer leader, laying out prayer mats, then cycling through a series of standing and kneeling motions.

Defendant Basham, a Lieutenant, was making her rounds for the evening when she observed Plaintiffs gathered in a large group, praying. She approached the group and told them to disperse, as she had done with at least one other unauthorized

3

Christian gathering in the past. Plaintiffs did not regard her or stop their praying. She gave the command again, ordering the Plaintiffs to disperse. Plaintiffs again ignored the command, except that one Plaintiff removed his Kufi[1]. She repeated the command a third time, to no further response. Basham then radioed for additional officers, in accordance with MDOC's Use of Force Guidelines and Reports policy IS20-3.1. That policy outlines the "use of force continuum," which details steps that staff should take to gain offender compliance before resorting to force. The first step in this continuum is psychological, meaning that staff makes a showing of physical presence.

Several staff members, including Defendants Hart, Spradling, Regan, and Fenwick, responded to Basham's call for assistance. These officers surrounded Plaintiffs, who continued to ignore them. Defendant Hart, in accordance with policy, verbally instructed the Plaintiffs multiple times to submit to restraints or he would use OC pepper spray. Defendants Hood and Holliman complied, and split off from the group. While they were being placed in restraints and led away, the remaining Plaintiffs continued to ignore the verbal warnings from Basham and Hart. Hart then administered a short burst of OC pepper spray to their faces, and they were placed in restraints (aside from Holliman and Hood, who had already voluntarily submitted to restraints). The officers then led them to the administrative segregation unit ("ad seg"), where they were placed in individual cells.

Plaintiffs allege that after the use of force, they were denied medical care and access to running water—specifically that Defendants turned off the water in their

---

[1] An Islamic head cap.

4

cells. Plaintiff Stafford alleges that he was beaten and choked in the immediate aftermath of the incident, and that when guards gave him new clothes, they provided him with underwear that had been sprayed with pepper spray, which he says he realized only after putting them on.

### Claims

**Count I: § 1983 First Amendment Free Exercise**

Plaintiff bring a § 1983 claim for deprivation of their First Amendment free exercise rights under color of law. This claim seeks damages from the individual capacity defendants (excluding Defendants Falkenrath, Stange, Hancock, T. Vandergriffe, and Morriss) as the events on and around February 28, 2021, and injunctive relief from the official capacity defendants for the current policies on religious practice in place at MDOC.

Plaintiffs will first need to prove that a governmental action "infringes upon a sincerely held religious belief." *Hamilton v. Schriro*, 74 F.3d 1545, 1550 (8th Cir. 1996). If Plaintiffs meet this threshold showing, then this Court will use the *Turner* factors to determine "if the regulation restricting the religious practice is 'reasonably related to legitimate penological objectives.'" *Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 983 (8th Cir. 2004) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 353 (1987)).

In *Turner v. Safley,* 472 US 78 (1987), the United States Supreme Court recognized that while prisoners retain their constitutional rights, those rights must sometimes yield to the needs of the penal system. Constitutional claims which would

5

ordinarily receive strict scrutiny analysis thus receive a lower standard of review. *Id.* at 81. That standard is more deferential to the judgement of corrections officials, and especially so when decisions implicate institutional security. *Id.* at 84-85.

Under *Turner*, the Court examines:

> (1) whether there is a valid, rational connection between the regulation and legitimate governmental interests put forward to justify it; (2) whether alternative means of exercising their rights remain open to the prisoners; (3) whether accommodation of the asserted rights will trigger a "ripple effect" on fellow inmates and prison officials; and (4) whether a ready alternative to the regulation would fully accommodate the prisoners' rights at de minimis cost to the valid penological interest.

*Beaulieu v. Ludeman*, 690 F.3d 1017, 1039 (8th Cir. 2012) (citing *Benzel v. Grammer*, 869 F.2d 1105, 1108 (8th Cir. 1989).

### *As Against Individual Capacity Defendants*

Plaintiffs conclude that:

> By assaulting and pepper spraying Plaintiffs while they prayed, confining them to seg [sic] after the attack, denying them necessary medical care, and retaliating against them in myriad ways described above, Defendants have substantially inhibited and constrained conduct and expression that manifests central tenets of Plaintiffs' individual religious beliefs.

Fourth Am. Comp., Doc. 90, 43. Plaintiffs will be unable to prove that the challenged actions of the pepper spraying, the ad seg stint, and the conduct violations came about as a result of MDOC's religious policies themselves, rather than the offenders' own actions in repeatedly ignoring orders from correctional staff. To prevail on this claim for damages, the Plaintiffs will need to prove that the rule requiring offenders to comply with orders from staff burdens their religious beliefs. Even if they can meet this burden, the claim will fail on the *Turner* analysis, because requiring

6

prison inmates to comply with orders exceeds the minimum rational relation to MDOC's goal of running their facilities in a safe, orderly manner.

### *As Against Official Capacity Defendants*

Plaintiffs allege that:

By promulgating and maintaining a policy that forbids Muslims from praying in congregation, Defendants prevent Muslim incarcerees from gathering for an Islamic purpose while they allow other incarcerees to gather for Christian or secular purposes.

Plaintiffs will fail to meet their burden here, as their testimony will establish that they are regularly allowed to pray in congregation. Application of the *Turner* factors will demonstrate that the limits on large group gatherings without authorization and on unauthorized group religious practice are reasonably related to MDOC's legitimate penological objectives.

**Count II: § 1983 Eighth Amendment Excessive Force**

Not all uses of force are excessive; "only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment" and violates the Eighth Amendment. *Peterson v. Heinen*, 89 F.4th 628, 635 (8th Cir. 2023) (*quoting Whitley v. Albers*, 475 U.S. 312, 319 (1986). "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Id*.

When analyzing a use of force, the "core judicial inquiry" is whether the accused officers applied force "in a good-faith effort to maintain or restore discipline,

7

or maliciously and sadistically to cause harm." *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). This analysis is guided by "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.' *Peterson*, 89 F.4th at 635; *Ward v. Smith*, 844 F.3d 717, 721 (8th Cir. 2016) ("Because the use of force is sometimes required in prison settings, guards are liable only if they are completely unjustified in using force, i.e., they are using it maliciously and sadistically."). This is a highly deferential standard. *Jackson v. Gutzmer*, 866 F.3d 969, 974 (8th Cir. 2017).

The word "sadistically" is not surplusage; "'maliciously' and 'sadistically' have different meanings, and the two together establish a higher level of intent than would either alone." *Howard v. Barnett*, 21 F.3d 868, 872 (8th Cir. 1994). One acts 'maliciously' by undertaking, without just cause or reason, a course of action intended to injure another; in contrast, one acts 'sadistically' by engaging in extreme or excessive cruelty or by delighting in cruelty." *United States v. Miller*, 477 F.3d 644, 647 (8th Cir. 2007).

Plaintiffs will fail to meet their burden of showing that the officers acted in the complete absence of justification when they used force on the noncompliant Plaintiffs.

**Count III: § 1983 First Amendment Retaliation**

To establish a First Amendment retaliation claim, Plaintiffs must show: "(1) [they] engaged in a protected activity, (2) the government took adverse action against the plaintiff[s] that would chill a person of ordinary firmness from continuing in the

8

activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Moon v. Boyd*, 727 F.Supp.3d 829, 846 (2024) (quoting *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007)); see also *Wolk v. City of Brooklyn Center*, 107 F.4th 854, 859-60 (8th Cir. 2024). As to the first prong, in proving whether the protected conduct was a "substantial or motivating factor in a decision, the decision makers must be aware of the protected conduct." *Lyons v. Vaught*, 781 F.3d 958, 962-63 (8th Cir. 2015).

In the prison context, a prisoner may maintain a retaliation claim for discipline if he can show that he was disciplined simply because he exercised his constitutional rights. *Hartsfield v. Nichols*, 511 F.3d 826, 829 (8th Cir. 2008). "Claims of retaliation fail, however, if the inmate actually violated a prison rule." *Spann v. Lombardi*, 65 F.4th 987, 993 (2023) (citing *Hartsfield,* 511 F.3d at 829). A retaliation claim cannot survive if the defendant can show at least "some evidence" that the inmate committed a rule violation. *Hartsfield,* 511 F.3d at 831. "[A] report from a correctional officer, even if disputed by the inmate and supported by no other evidence, legally suffices as 'some evidence' upon which to base a prison disciplinary violation, if the violation is found by an impartial decisionmaker." *Id.*

As to the second prong, a plaintiff must show that the alleged adverse action "would chill a person of ordinary firmness from continuing in the [protected] activity." *Moon,* 727 F.Supp.3d at 846 (citing *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004). This is an objective test that questions how a prisoner of ordinary firmness would respond under a like scenario. *Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir.

9

2013); see also *Lamar v. Payne*, 111 F.4th 902, 909 (8th Cir. 2024). Plaintiffs' subjective actions in response to the alleged retaliation is a factor in determining what a reasonable prisoner of ordinary firmness would have done, but is not itself dispositive. *Id.*

Finally, a plaintiff must prove that the retaliatory purpose was the "but-for" cause of the adverse action. *McSean v. Bainbridge*, 2026 WL 183550, at *3 (E.D. Mo. Jan. 23, 2026); see also *Beard v. Falkenwrath*, 94 F.4th 1109 (2024); *Nieves v. Bartlett*, 587 U.S. 391, 398-99 (2019). Without showing that the adverse action was the "but-for cause" of the injury suffered by plaintiff, Plaintiffs' claims must fail. *Beard*, 94 F.4th at 1119 (2024).

Here, Plaintiffs will fail to meet their burden as to each prong of the First Amendment retaliation analysis. First, while plaintiffs may allege that they were engaged in prayer, they will not be able to prove that gathering in a large group inside of their housing unit was a protected activity. Additionally, Plaintiffs will be unable to prove that any Defendant took adverse action that would chill a prisoner of ordinary firmness from continuing the activity of prayer. Furthermore, they will be unable to prove that the alleged adverse action was motivated specifically by any religious animus. Plaintiffs will not be able to establish that Defendants ordered Plaintiffs to stop praying *because* the Plaintiffs were engaged in Muslim prayer. Rather, the evidence will show that large group activity, including but not limited to prayer, was not permitted regardless of the religion due to institutional safety and security concerns. Finally, Plaintiffs will not be able to show that the protected

10

activity was the but-for causation of their transfer to other institutions or loss of any privileges.

**Count IV: § 1983 Eighth Amendment Deliberate Indifference**

To prevail on a claim of constitutionally inadequate medical care, Plaintiffs must show that the prison officials' conduct amounted to "deliberate indifference to [their] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); see also *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir.1997).

An Eighth Amendment claim that prison officials were deliberately indifferent to the medical needs of inmates involves both an objective and a subjective component. *Coleman*, 114 F.3d at 784. The objective component requires proof that inmates are exposed in a manner that created an unreasonable risk of serious harm to health. *See Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006).

The subjective component requires proof of a "highly culpable state of mind approaching actual intent to harm the inmate." *Joseph v. Wheeler*, 144 F.4th 1111, 1113 (8th Cir. 2025) (citing *Kulkay v. Roy*, 847 F.3d 637, 643 (8th Cir. 2017). Negligence and gross negligence are insufficient states of mind to support this prong. *Id.* Rather, the prison officials must have acted with, at minimum, criminal recklessness. *Dean v. Bearden*, 79 F.4th 986, 989 (8th Cir. 2023). As such, the Eighth Circuit has observed that the deliberate indifference is a "difficult standard to meet." *Wheeler*, 114 F.4th at 1113.

Plaintiffs allege that they were not seen by medical staff until some time after

11

the effects of the pepper spray had worn off, and Plaintiff Stafford alleges that he was not seen by medical staff for weeks. If, however, the evidence shows that Plaintiffs were seen by medical staff after the use of pepper spray, then Defendants would be entitled to defer to their conclusions regarding what treatment, if any, Plaintiffs required because "[p]rison officials lacking medical expertise are entitled to rely on the opinions of medical staff regarding inmate diagnosis." *Jones v. Faulkner Cnty, Ark.,* 131 F.4th 869, 876 (8th Cir. 2025) (quoting *Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011)).

Furthermore, to the extent that Plaintiffs' claimed injuries are predicated on the alleged delay in medical treatment, they must "present verifying medical evidence that the prison officials ignored an acute or escalating situation or that these delays adversely affected [their] prognosis." *Redmond v. Kosinski*, 999 F.3d 1116, 1121 (8th Cir. 2021) (quoting *Holden*, 663 F.3d at 342).

Plaintiffs will be unable to meet their burden in demonstrating that they failed to receive medical attention. Likewise, they will fail to show that any delay in providing medical care caused longstanding physical harm.

**Count V: Fourteenth Amendment Equal Protection**

"The Fourteenth Amendment requires that the government 'treat similarly situated people alike,' a protection that applies to prison inmates." *Murphy*, 372 F.3d at 985 (8th Cir. 2004) (quoting *Rouse v. Benson,* 193 F.3d 936, 942 (8th Cir.1999) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985))). "Treatment of dissimilarly situated persons in a dissimilar manner by the

12

government does not violate the Equal Protection Clause." *Keevan v. Smith*, 100 F.3d 644, 648 (8th Cir. 1996) (citing *Klinger v. Department of Corrections*, 31 F.3d 727, 731 (8th Cir.1994), *cert. denied*, 513 U.S. 1185, (1995).

### *Discrimination on the Basis of Religion*

MDOC's religious practice policy is facially neutral and equally applicable to all religious practices within MDOC. To meet their burden on their religious equal protection claim, Plaintiffs must show that they are "treated differently than a similarly situated class of inmates, that the different treatment burdens one of [their] fundamental rights, and that the different treatment bears no rational relation to any legitimate penal interest. *Murphy,* 372 F.3d at 985 (citing *Weiler v. Purkett,* 137 F.3d 1047, 1051 (8th Cir.1998) (en banc)).

Plaintiffs will fail to meet their burden as to each prong of the equal protection analysis. In general, they will be unable to prove that Muslims are treated any differently than other similarly situated religious groups within MDOC. Here, the appropriate comparison would be other "fully accommodated" religions, including Christianity, Catholicism, and Buddhism, as that is the classification given to the Al-Islam religion that Plaintiffs practice. All fully accommodated religions, subject to the continuing minimum membership requirements, are treated the same by MDOC policy. To the extent that Plaintiffs prove a disparate impact on their practice from these facially neutral policies, they will fail to make the required showing that that any discrepancies are motivated by discriminatory intent. *Keevan*, 100 F.3d at 651 (8th Cir. 1996) ("Discriminatory purpose implies more than intent as volition or

13

intent as awareness of consequences. It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." (cleaned up)).

To the extent that Plaintiffs claim the use of force to be evidence of different treatment from other groups, the argument fails for two reasons: first, those groups are not similarly situated to the extent that they did not attempt to engage in unauthorized group religious practice and then ignore direct orders from staff, and second, the "different treatment" they received (i.e., being pepper sprayed) bears a rational relation to the legitimate penal interest of maintaining orderly control and security within a correctional institution.

In short, Plaintiffs will fail to meet their burden on this Count because they cannot prove that their religion is or was treated any differently than other religions, and because they cannot prove that the use of force on February 28, 2021 or their subsequent treatment was motivated by their membership in a class aside from "those who refuse orders from correctional officers," which is not a class protected by the Fourteenth Amendment.

### *On the Basis of Race*

Plaintiffs allege that Defendants treated Plaintiff Holliman "more favorably" than the other Plaintiffs because he is white. This claim arises from the allegation that "[o]fficers escorted Holliman, who is white—but not Hood, who is Black, like the rest of the Plaintiffs—out of range of the pepper spray attack that began moments later, saying 'Let's get you out of here before you get sprayed.'" Doc. 90, 18.

14

However, Plaintiffs will fail to meet their burden of proof on this claim, because they will fail to prove that Holliman was treated differently from other Plaintiffs on the basis of his race.

**Count VI: Religious Land Use and Institutionalized Persons Act ("RLUIPA") Free Exercise**

"RLUIPA prohibits the government from imposing a substantial burden on a jail inmate's religious exercise, even if the burden results from a rule of general applicability, unless the government shows that the burden is the least restrictive means of furthering a compelling government interest." *Barnett v. Short*, 129 F.4th 534, 539 (8th Cir. 2025).

Plaintiffs must first demonstrate that the current policies impose a substantial burden on their ability to exercise their religion. *Van Wyhe v. Reisch*, 581 F.3d 639, 654 (8th Cir. 2009). To constitute a "substantial burden," government actions "must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs;" "meaningfully curtail" ability to express adherence to his faith; or "deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." *Gladson v. Iowa Dept. of Corrections*, 551 F.3d 825, 832 (8th Cir. 2009).

RLUIPA, however, does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005). RLUIPA should be applied "in an appropriately balanced way, with particular sensitivity to security concerns." *Cutter*, 544 U.S. at 722.

15

The Plaintiffs in this case contend that group prayer is preferable to individual prayer, in that it confers many times more blessings than individual prayer. The evidence will show that Muslims in MDOC receive many religious accommodations in the practice of their faith, including the ability to pray individually in their cells and many structured services within the prison chapels. Those services include a Friday Jumah service, where there is no cap on the number of offenders who can pray together aside from the number of willing participants and physical space limits, which the Muslim population within ERDCC have yet to approach. Muslims within MDOC can also obtain copies of the Quran (and other religious reading materials) upon request, subject normal personal property limits. MDOC also accommodates the Muslim holy month of Ramadan, adjusting meal times to ensure practitioners are able to fast from sunrise to sunset and providing special service times.

Additionally, there are procedures built into MDOC policy that provide inmates the ability to request accommodation of additional religious rituals or gatherings not already permitted in their accommodations. Plaintiffs do not allege that they availed themselves of these procedure.

The Plaintiffs will not be able to prove that the religious accommodation policies within MDOC burden their religious beliefs, because they have accommodations that allow them to practice their faith and allow them to request additional accommodations. To the extent this Court finds such a burden, that burden is the least restrictive means of accommodating the religious needs of Plaintiffs (and the many other religions practiced within MDOC) in light of the compelling state

interest of maintain order and security within a maximum security prison.

**Count VII: Missouri State Law Battery**

To prevail on the Missouri common law claim of battery, Plaintiff Clemons must prove that the Defendant Hart caused an "intended, offensive bodily contact" with him. *Devitre v. Orthopedic Ctr. of St. Louis, LLC*, 349 S.W.3d 327, 334 (Mo. 2011). Additionally, given the context of enforcing lawful prison rules, he will need to prove that Hart used "more force than was reasonably necessary" in gaining his compliance. *Neal v. Helbling*, 726 S.W.2d 483, 487 (Mo. Ct. App. 1987).

Plaintiff Clemons will fail to meet his burden as to his state-law tort claim for battery against Defendant Hart, because he will be unable to prove that the touching caused by Hart was more force than was reasonably necessary to gain his compliance.

## Additional Issues

**Affirmative Defense of Qualified Immunity**

A government official is protected by qualified immunity "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). To defeat the protection of qualified immunity, the plaintiff must (1) assert a violation of a constitutional or statutory right, (2) that was "clearly established" at the time of the violation, and (3) that a "reasonable official would have known that the alleged action indeed violated that right." *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998).

"Whether a reasonable official would have known that his actions violated an established right involves both an objective and subjective component." *Francisco v.*

*Corizon Health, Inc.*, 108 F.4th 1072, 1077 (8th Cir. 2024), *cert. denied sub nom. Francisco v. England*, 145 S. Ct. 1332 (2025), citing Liebe, 157 F.3d at 577. "The objective component concerns whether a serious deprivation occurred." *Id.* "The subjective component examines the official's state of mind to determine whether he acted with" malice, sadism, or deliberate indifference (depending on the claim). *Id.*

The individual capacity defendants are entitled to qualified immunity as to each claim brought against them, because Plaintiffs have not shown, and will not be able to show, that it was clearly established on February 28, 2021 that MDOC's religious exercise, use of force, or inmate transfer policies violated Plaintiff's rights.

Furthermore, to the extent that this Court can avoid treading new ground in deciding Plaintiff's constitutional claims by granting qualified immunity on the "clearly established" prong, it should find in favor of Defendants.

Respectfully Submitted,

**CATHERINE L. HANAWAY**
Missouri Attorney General

*/s/ Scott J. Bower*
Scott J. Bower, #75486 (MO)
Isabelle McNally, #78386 (MO)
Wolfgang A. Schaefer, #78191 (MO)
Assistant Attorneys General
221 West High Street
Jefferson City, MO 65101
Phone: (573) 751-8108
scott.bower@ago.mo.gov
isabelle.mcnally@ago.mo.gov
wolfgang.schaefer@ago.mo.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2026, the foregoing was filed electronically via the Court's electronic filing system and was served by the operation of the court's electronic filing system on all counsel of record.

/s/ *Scott J. Bower*
Scott J. Bower
Assistant Attorney General

/s/ *Isabelle McNally*
Isabelle McNally
Assistant Attorney General

/s/ *Wolfgang A. Schaefer*
Wolfgang A. Schaefer
Assistant Attorney General