## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI

REGINALD CLEMONS           )
                           )
           Plaintiff,      )
                           )
v.                         )        Case No. 4:22-CV-00158-SRW
                           )
MICHELLE BASHAM, et al.,   )
                           )
           Defendants.     )

## Judgment as a Matter of Law

Judgment for the Defendants as a matter of law is appropriate on all counts. Viewing the evidence in the light most favorable to the Plaintiffs, without weighing evidence or making credibility determinations, prompts only one conclusion: Defendants are not liable for the Constitutional or statutory rights violations alleged by Plaintiffs. Now that Plaintiffs have been fully heard and their evidence proves insufficient, this Court should grant Defendants' Judgment as a matter of law.

## Legal Standard

When "the evidence points one way and is susceptible to no reasonable inference sustaining the position of the nonmoving party," judgment as a matter of law is appropriate. *Sayger v. Riceland Foods, Inc.*, 735 F.3d 1025, 1030

(8th Cir. 2013). Indeed, a nonmoving party's failure to establish any legally sufficient evidentiary basis for a reasonable jury to find for him on an essential issue renders judgment as a matter of law proper. Fed. R. Civ. P. 50(a).

<u>Argument</u>

Plaintiffs failed to establish any legally sufficient evidentiary basis on at least one essential issue of their First Amendment, Eighth Amendment, and statutory claims. In addition, Defendants are entitled to qualified immunity. Accordingly, judgment as a matter of law is appropriate.

**I.    Defendants are entitled to judgment as a matter of law on Plaintiffs' First Amendment and Religious Land Use and Institutionalized Persons Act claims.**

Plaintiff alleges Defendants violated both the First Amendment's Free Exercise Clause and RLUIPA by prohibiting and punishing them for praying in a large group in the cell blocks common area on the night of February 28, 2021.

Under both the Free Exercise Clause and RLUIPA, Plaintiffs must first raise a material question of fact regarding whether Defendants' have placed a substantial burden on Plaintiffs' ability to practice their religion. See *Weir v. Nix*, 114 F.3d 817, 820 (1997) (analyzing the Free Exercise Clause of the First Amendment); *Patel v. U.S. Bureau of Prisons,* 515 F.3d 807, 813 (8th Cir. 2008); 42 U.S.C. §2000cc-1(a) (RLUIPA). The Free Exercise Clause and

RLUIPA differ in their analysis of whether a regulation constitutes a 'substantial burden' to practicing religion.

### i.    <u>First Amendment Free Exercise Clause:</u>

While prisoners retain constitutional rights, they are subject to limitations of those rights in light of the needs of the penal system. *Gladson v. Iowa Dept. of Corr.*, 551 F.3d 825, 831-32 (8th Cir. 2009) citing *Murphy v. Mo. Dept. of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004). "A prison regulation or action is valid, therefore, even if it restricts a prisoner's constitutional rights if it is 'reasonably related to legitimate penological interests'." *Id.* quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987). In determining whether the restriction of a prisoner's constitutional rights are reasonably related to legitimate penological interests, Courts consider four *Turner* factors:

> "(1) Whether there is a 'valid rational connection' between the prison regulation and the government interest in justifying it;
>
> (2) Whether there is an alternative means available to the prison inmates to exercise this right;
>
> (3) Whether an accommodation would have a significant ripple effect on the guards, other inmates, and prison resources; and
>
> (4) Whether there is an alternative that fully accommodates the prisoner at a de minimus cost to valid penological interests."

*Id.* at 982-83 (quoting *Turner*, 482 U.S. at 89-91, 107 S.Ct. 2254) (internal citations omitted)). "With regard to the second factor, a prisoner need not be

afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so." *Id*. at 983 (internal citations omitted).

In analyzing a Free Exercise Clause claim, Court's consider "first the threshold issue of whether the challenged governmental action infringes upon a sincerely held religious belief and then apply the *Turner* factors to determine if the regulation restricting the practice is reasonably related to legitimate penological objectives. *Gladson*, 551 F.3d. at 831-32 (internal citations and quotations omitted). Under the first amendment's Free Exercise clause, a prisoner must first allege facts demonstrating that the prison placed a substantial burden on his ability to practice his religion. *Moon v. Boyd*, 727 F.Supp.3d 829, 848-49 (U.S. Dist. E.D. Mo. 2024) (analyzing U.S. Const. Amend. 1). Substantially burdening one's free exercise of religion means that the regulation must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; <u>or</u> must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." *Patel*, 515 F.3d at 813 (emphasis added).

"When determining whether prison regulation infringing upon prisoner's constitutional right is reasonably related to penological interest, deference should be given to decisions of prison administrators, especially when those

4

decisions deal with issues of prison safety and security." *Moon,* 727 F.Supp.3d at 848-49; also, *Gladson*, 551 F.3d at 831-32.

Here, Plaintiffs' <u>fail</u> to show that their ability to practice their Muslim religion was substantially burdened and that no penological objective was served. Plaintiffs' allege that Defendants substantially burden their ability to practice their religion by prohibiting group prayers in the common areas of the cell blocks and by having pepper sprayed, cuffed, moved to administrative segregation and issued conduct violations to Plaintiffs' who refused directives to disperse from their large prayer group in the common area. Doc. 90 ¶156, 157. First, these Offenders were are repeatedly informed, both verbally and in written policy, that religious gatherings are to be held in the chapel, or upon permission from and with supervision of the Chaplain or their designee, in preapproved designated areas. See Defendants Exhibit 1 at III.A.1,.2 ("Each institution shall designate appropriate areas for conducting religious services and activities." "All meetings and activities of a religious or spiritual nature shall be scheduled through the chaplain and shall be held in the chapel or other designated areas under the control and supervision of the chaplain or designee.").

But, this does not mean that Plaintiffs could not engage in prayer outside the chapel or designated areas. Inmates are expressly allowed to "individually engage in private religious practices in their living quarters unless the

5

practices poses a threat to the safety and security of the institution." *Id.* at III.A.3. Large groups gathered tightly in the common area of the cell block poses a safety and security threat to the institution. Plaintiffs' group consisted of nine inmates, bunched tightly together blocking cell doors and walkways. Plaintiff's Exhibit 1; 2. And because this gathering occurred during February 2021, such close contact of numerous offenders violated the Covid-19 and flu pandemic prevention guidelines, posing a significant health risk to the whole housing unit. See Plaintiffs' Exhibit 9 ERDCC's Flu/Pandemic Plan; Plaintiffs' Exhibit 8 ERDCC's contagious disease preparedness plan ("standard precautions shall be used…standing three to six feet away from another person"); Plaintiffs' Exhibit 7 ERDCC Covid-19 Operational Plan (discusses cancellation of group activities, recreation that involves close contact, redirecting chaplain services and educational services to be completed individually in cells, etc.).

Plaintiffs are also mistaken regarding why corrective action was taken. Every inmate, upon entrance into the Missouri prison system, receives an Offender Handbook which describes rules of conduct and procedures punishments and grievances. See Plaintiff's Exhibit 11. Conduct Rule 9 defines organized disobedience as a conduct violation, with Rule 9.1 stating "[t]here of more offenders gathering in a non-violent manner who refuse to obey orders" is a violation of inmate conduct which results in "issuance of conduct violation

6

with appropriate corrective actions imposed". Plaintiff's Exhibit 11, at pg. 12, 19 bates 63, 70. Plaintiffs admit that they gathered in a group of nine inmates in the back of the common area of the housing unit.

Plaintiffs admit they were told to disperse from their large group. They admit that they heard this order. And each admitted that they did took no action in response to it. They did not explain that they were almost done, they did not ask what rule they had violated or the reason for the order, and they did not ask to be allowed to finish. Instead, each admitted that they gave no acknowledgement of any kind to the officers. Plaintiff Stafford admitted that there was no way for Lt. Basham to know what was happening in their heads at the time. He admitted that to her, these inmates were simply ignoring her orders. This went on for about two minutes before any pepper spray was used. *See* Plaintiff's Exhibits 1 and 2 (showing that Basham approaching the Plaintiffs at 9:11:33 p.m., and pepper spray being used around 9:13:25 to 9:13:30).

Plaintiffs were already a large group, and paired with the other numerous inmates in the housing unit, any refusal to disperse from a group puts officers and security of the institution at risk. Further, Plaintiffs' espoused beliefs heighten the safety and security concerns justifying the policies enforced here. Some Plaintiffs testified that they heard the orders to disperse, but believed that they could decide to ignore the order because they

7

were praying. This shows a strong safety and security rationale: there will sometimes be orders where timely compliance is essential. Likewise, there may be orders where compliance is essential, but the reason is not immediately clear, like an escape attempt in the institution not in visible sight of the offenders.

Plaintiffs' mistakenly believe they were targeting because they were praying. But, based on the evidence presented, that is <u>not</u> the reason for the dispersal order and corrective action. Plaintiffs' were ordered to follow implemented policies that prohibiting large gatherings in the common areas of the housing unit, whether that group be gathered for Religious prayer or not. And when Plaintiffs' gathered in such a large group, they violated prison policy. When Plaintiffs' refused all verbal commands to disperse from the group, they not only violated policy and verbal commands but now presented a threat to institutional safety and security. Dispersing their large group and praying in their cells is not a substantial burden. See Clemons v. Basham, 2022 WL 6722377 (U.S. Dist. E.D. Mo. 2022) (Court finds Clemons ability to practice religion was not substantially burdened); See *Mbonyunkiza v. Beasley*, 946 F.3d 1048, 1054 (8th Cir. 2020) (discussing how regulation does not substantially burden his religious belief); *Patel*, 515 F.3d at 815 (holding a prisoner-plaintiff must show he has exhausted alternative means of accommodating his religious…needs to prove a substantial burden).

8

Here, several Plaintiffs admitted that they were familiar with the process outlined in IS17-1.1, Defendants' Exhibit 1, for requesting religious accommodations not yet afforded. However, each admitted that they failed to follow this request process in seeking the ability to gather for congregational prayer in a group of nine within the day room of their Housing Unit.

The orders and actions taken by Defendants on February 28, 2021 had nothing to do with religion and everything to do with maintaining order, safety, and security of the institution. No reasonably jury could conclude, based on the evidence presented, that the Plaintiffs' ability to practice their religion was substantially burdened.

Further, no reasonable jury could conclude that the policies of the Department substantially burden Plaintiff's free exercise rights. Plaintiff Hood testified to the fact that Muslims within MDOC are given the option to have Halal meals rather than the normal meal service. He testified to the fact that Muslims within MDOC are given two weekly services in the chapels of various institutions. He and Plaintiff Stafford both testified to the many accommodations given to Muslims within the holy month of Ramadan, where Muslim inmates fast during the daytime hours for 30 days. This involves meal delivery before sun up (before normal breakfast service) and after sun down (after normal dinner service), that there are additional religious services in the chapel during that holy month, and that these inmates are allowed to pray in

9

congregation in these services. Likewise, Plaintiffs have not identified any attempt to use the MDOC grievance procedure, nor the religious accommodations request procedure outlined in Defendants' Exhibit 1, to get an accommodation to pray as a group within their housing unit.

As such, judgment as a matter of law in favor of Defendants is appropriate on Count I.

### ii.    <u>Religious Land Use and Institutionalized Persons Act</u>

A prisoner's statutory claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA) is evaluated under a different, higher standard than a First Amendment claim. *Gladson,* 551 F.3d at 831-32; also *Murphy,* 372 F.3d at 987. The RLUIPA Statute provides, in relevant part:

> "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution …even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>
> > (1) Is in furtherance of a compelling governmental interest; and
> >
> > (2) Is the least restrictive means of furthering that compelling governmental interest."

42 U.S.C. §2000cc-1(a). While the government must meet a higher burden than the rational relationship test applied in constitutional cases, significant deference is given to the expertise of prison officials in evaluating whether they

met that burden. *Gladson,* 551 F.3d at 831-32; also *Murphy,* 372 F.3d at 987. The RLUIPA does not elevate accommodation of religious observances over an institution's need to maintain order and safety. *Cutter v. Wilkinson,* 544 U.S. 709, 722-23 (2005). Indeed, while the "Act adopts a 'compelling interest' standard, §2000cc-1(a), context matters in the application of that standard. *Id.* (internal quotations omitted). When enacting RLUIPA, lawmakers intended mindfulness of the urgency of discipline, order, safety, and security in penal institutions and anticipated that Courts would apply the Act's standard with due deference to prison administrators' experiences and expertise. *Id.*

As a threshold matter, RLUIPA requires plaintiffs" to show "that there is a substantial burden on [their] ability to exercise [their] religion." *Gladson,* 551 F.3d at 832 (citing, *Murphy,* 372 F.3d at 988). "To constitute a substantial burden, government police or actions: (1) must significantly inhibit or constrain conduct or expression of a person's individual religious beliefs; (2) must meaningfully curtail a person's ability to express adherence to his or her faith; or (3) must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." *Gladson,* 551 F.3d at 832 (citing 42 U.S.C. §2000cc-2(b) (internal quotations, citations, and alternations omitted). It is plaintiffs" burden to establish that the correctional facility has placed a substantial burden on their religious belief. *Id.* Plaintiffs have failed to do so.

11

Plaintiffs were never told that they could not practice their religion, that they could not pray, nor that they could not gather in prayer. Plaintiffs were told they could not pray in a large group in the common area of the housing unit. Large group assembly poses safety and security risks, particularly during the Covid-19 Pandemic. Indeed, during the Covid-19 pandemic, religious assemblies worldwide were prohibited, not just at ERDCC and not just for those of Islamic faiths. Plaintiffs were told to disperse from their group but refused multiple directives. Their refusal also posed a security and safety risk. The correctional facility had a legitimate and compelling reason to prohibit group gatherings in the tight quarters of the housing unit common area and to control inmates refusing to comply with directives.

Plaintiffs were not substantially burdened from practicing their religion. Plaintiffs have failed to provide any evidentiary support necessary to show that praying in their cells instead of the common area of the wing amounts to a substantial burden. In fact, several Plaintiffs testified that they did one or two of their five prayers on February 28 in their cells. Each Plaintiff was allowed a prayer rug, their Kufis, their holy texts, and allowed to pray in the privacy of their cells. Prison policy at this time forbad large gatherings in the common areas and even tighter restrictions for group meetings were in place given the Covid-19 pandemic. The safer and easily accessibly alternative to go to their cell for prayer or request permission from the chaplain services to schedule

12

group prayers in designated areas following proscribed guidelines was at all times available to plaintiffs". Because Defendants did not create a substantial burden on plaintiffs' ability to pray, the RLUIPA claims fail. No reasonably jury could find that Defendants' caused a substantial burden to plaintiffs' ability to pray. The only "burden" on their ability to pray in the late evening of February 28, 2021 was their choice to ignore directions from corrections staff for nearly two minutes, while not even acknowledging their presence. Therefore, judgment as a matter of law in favor of Defendants as to Count VI is appropriate.

## II.    Defendants are entitled to judgment as a matter of law on Plaintiffs' Eighth amendment excessive force claims.

Not all uses of force are excessive; "only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment" in violation of the Eighth Amendment. *Peterson v. Heinen*, 89 F.4th 62, 635 (8th Cir. 2023) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized and applied for security purposes was unreasonable, and hence, unnecessary in the strict sense. *Id*. (quotations omitted).

When analyzing a use of force, the "core judicial inquiry" is whether the accused officers applied force "in a good-faith effort to maintain or restore

13

discipline, or maliciously and sadistically to cause harm." *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *Jackson v. Gutzmer*, 866 F.3d 969, 974 (8th Cir. 2017). This analysis is guided by "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response." *Peterson,* 89 F.4th at 635; *Ward v. Smith*, 844 F.3d 717, 721 (8th Cir. 2016). This standard is highly deferential to the officers. See *Gutzmer,* 866 F.3d 969, 974.

The Eighth Circuit noted that "limited applications of pepper spray used to control a recalcitrant inmate constitutes a tempered response by prison officials when compared to other forms of force." *Ausler v. Hopgood*, No. 4:21CV644, 2023 WL 4884399 *5 (U.S. Dist. E.D. Mo. 2023) (citing *Jones v. Shields,* 207 F.3d 491, 495-6 (8th Cir. 2000) (Plaintiff failed to establish "malicious and sadistic" conduct when the defendant sprayed pepper spray in the face of a large inmate who refused a work order and objected profanely when ordered to return to his barracks.). The use of pepper spray must be "reasonable under the circumstances," but it must not be "punitive, arbitrary, or malicious." *Thomas v. Northern*, 574 F.Supp.2d 1029, 1034 (U.S. Dist. E.D. Mo. 2008) (citing *Treats*, 308 F.3d at 873). "Because the use of force is sometimes required in prison settings, guards are liable only if they are

completely unjustified in using force, i.e. they are using it maliciously and sadistically." *Ward*, 844 F.3d at 721.

Here, only Defendant Hart is alleged to have used pepper spray. Defendant Hart, after receiving an officer in distress radio call, arrived at the housing unit to see a group of inmates refusing orders to disperse, refusing orders to cuff up, and creating a disturbance in a housing unit where the other inmates present were milling about. In his assessment of the situation, correctional officers were outnumbered by inmates and a group had become disobedient and recalcitrant to verbal directives. Based on the amount of disobedient inmates and the potential for a riot or further disobedience from the other inmates present, Defendant Hart used a tempered response to restore order when he administered pepper spray onto the disobedient group. Several Plaintiffs even testified that this use of force was not sufficient to gain their compliance.

Importantly, Plaintiffs' allege only Defendant Hart used pepper spray. Other officers present cannot be held liable simply because they were present or held a supervisory position in the prison. Clemons, 2022 WL 6722377 at *9. A supervisor may not be held liable under § 1983 for the constitutional violations of a subordinate on a respondeat superior theory." *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001) (*citing Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995)). "Liability under § 1983 requires a causal link to, and direct

responsibility for, the deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990). Under § 1983, a Plaintiff must prove that the defendant was personally involved in or directly responsible for the incidents that deprived the plaintiff of his constitutional rights. *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995). Because Plaintiffs fail to allege that any of the other named Defendants had used pepper spray on them during the February 2021 use of force, those defendants cannot be held liable for excessive force in violation of the Eighth Amendment.

Likewise, Plaintiffs failed to identify any other individual aside from Defendants Hart of Spradling who were involved in the controlled takedown of Plaintiff Stafford. Accordingly, no reasonable jury could find that any other Defendant violated Plaintiff Stafford's Eighth Amendment rights in that controlled takedown.

Given the above, judgment as a matter of law in favor of the Defendants is appropriate.

### III. Defendants are entitled to judgment as a matter of law on Plaintiffs' Eighth amendment deliberate indifference claims.

To prevail on a deliberate indifference claim, a prisoner plaintiff must clear a substantial evidentiary threshold and demonstrate that (1) he suffered from an objectively serious medical need and (2) defendants actually knew of that need and deliberately, with subjective intent, disregarded that need.

*Presson v. Reed*, 65 F.4th 357, 366 (8th Cir. 2023). "Deliberate indifference is more than negligence, more than even gross negligence." *Id*. For purposes of a claim for deliberate indifference to prisoner's medical needs in violation of Eighth Amendment, to be *objectively* serious, a medical need must have been diagnosed by a physician as requiring treatment or must be so obvious that even a layperson would easily recognize the necessity for a doctor's attention. *Moon*, 727 F.Supp.3d at 852 (emphasis added) (citing *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016) and *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014)).

Under the subjective component, an official is deliberately indifferent if they know of and disregard an excessive risk to inmate health or safety, and the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and they must also draw the inference. *Moon*, 727 F.Supp.3d at 852 (citing *Farmer v. Brennan*, 511 U.S. at 837 (1994)). "A showing of a prison official's deliberate indifference to a prisoner' serious medical needs in violation of the Eighth Amendment requires a mental state akin to criminal recklessness." *Id*. (citing *Barton,* 820 F.3d at 965 and quoting *Jackson*, 756 F.3d at 1065) (internal quotations omitted). "For purposes of a claim for deliberate indifference to a prisoner's serious medical needs under the Eighth Amendment, medical malpractice, inadvertent failure to provide adequate medical care, or simple negligence do not amount to

constitutional violation." *Id.* citing *Dulany v. Carnahan*, 132 F.3d 1234, 1239, 1243 (8th Cir. 1997). "An inmate must demonstrate that a prison [employee's] actions were 'so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care.'" *Jackson v. Buckman*, 756 F.3d 1060, 1066 (8th Cir. 2014) (quoting *Dulaney*, 132F.3d at 1240-41). Allegations of mere negligence in giving or failing to provide medical treatment will not suffice. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Nothing on the record supports Plaintiffs' contention that Defendants intentionally interfered, delayed, or ignored any serious medical needs of Plaintiffs. Medical staff were called to evaluate the inmates involved in the use of force that night. Plaintiffs' were seen by medical personal immediately following the use of force and placement in administrative segregation. Plaintiffs' Exhibit 37 at pg. 8 ("Offender [Stafford] assessed by medical"); Plaintiffs' Exhibit 54 at pg. 9 (Use of Force Report "[medical examination and description of offender injuries] A medical assessment was conducted on 2/28/2021…with no injuries reported…"); Plaintiffs' Exhibit 59 at pg. 7, 8. Specifically, during Plaintiff Stafford's medical evaluation, he reported that his eyes did not burn, he did not have difficulty breathing, did not complain of other injuries, had even and unlabored respirations of the lungs. Plaintiffs' Exhibit 23. And during Plaintiff Clemons' medical evaluation, he reported his eyes did not burn, he did not have difficulty breathing, he did not complain of

18

other injuries and he had even and unlabored respirations of the lungs. Plaintiffs' Exhibit 30 at pg. 71-72. And during Plaintiff Harris' medical evaluation, he reported his eyes did not burn, he did not have difficulty breathing, he did not complain of other injuries, and he had even and unlabored respirations of the lungs. Plaintiffs" Exhibit 49 at pg. 190-91.

Additionally, Plaintiff Hood must be dismissed from this claim. He testified that he was seen by medical staff and refused any form of treatment because he did not trust medical staff. As such, no reasonable jury could find that he was denied medical treatment in violation of the Eighth Amendment.

Defendants were not aware of the Plaintiffs particular medical needs, and to the extent that they understood Plaintiffs' were pepper sprayed or near pepper spray, Defendants justifiable deferred to medical staff for redress. *Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011) (Prison officials lacking medical expertise are entitled to rely on the opinions of medical staff.). Given the above, judgment as a matter of law in favor of Defendants is appropriate.

## IV. **Defendants are entitled to judgment as a matter of law on Plaintiff's Fourteenth Amendment claims.**

### ***On the basis of religion:***

Plaintiffs have failed to establish that their Fourteenth Amendment Equal Protection Clause was violated by Defendants. The Equal Protection Clause "prohibits government officials from selectively applying the law in a

19

discriminatory way." *Central Airlines, Inc. v. United States*, 138 F.3d 333, 334-35 (8th Cir. 1998) (citation omitted); See also *Casey-E v. Better Family Life*, 2018 WL 6082900 at *2 (U.S. Dist. E.D. Mo. 2018) ("The Fourteenth Amendment pertains to claims involving state action exclusively, and not to any action of private individuals.").

Plaintiffs' allege that they were prohibited from praying in a large group in the housing unit common area because they were practicing Islam. But Plaintiffs', as discussed supra, are mistaken. Missouri Department of Corrections have policies and guidelines prohibiting large, unsanctioned gatherings by inmates, especially in the common areas of the housing unit. Plaintiffs' were gathered in a large group and when told to disperse from their large group, refused multiple verbal commands. Plaintiffs' were allowed to continuing their prayers in their cells. Plaintiffs' were not confronted for practicing Islam, in a manner unequal to those of other religions.

In fact, there is another instance of these rules being enforced in the record already: Michelle Basham testified that she had broken up a similarly sized group of inmates holding a Christian pray circle. Those inmates apologized and dispersed.

Plaintiffs' were confronted and told to disperse because they were in a large group and praying outside of the designated area for group religious practice. Plaintiffs' have failed to provide any sufficient evidence that those of

20

other religions were allowed to gather, without permission, in the common area of the housing unit for group prayer. Given the above, Plaintiffs' Equal Protection rights were not violated by Defendants. As such, judgement as a matter of law in favor of Defendants is appropriate.

### *On the basis of race:*

There is simply no evidence in the record from which a reasonably jury could conclude that any Defendant treated any Defendant differently on the basis of their race or perceived race. As each Plaintiff agreed, their being pepper sprayed or not turned not on their ethnicity, but on whether they complied with the orders to disperse. As such, judgement as a matter of law on Plaintiffs' race-based equal protection claim is appropriate.

## V.    Defendant Hart is entitled to official immunity barring Plaintiff Clemons' Missouri tort claim of Battery and this judgment as a matter of law is appropriate.

Official immunity bars Plaintiff Clemons' state-based tort law battery claim. The doctrine of official immunity has a long history of application in the State of Missouri. *State ex rel Love v. Cunningham*, 689 S.W.3d 489, 495 (Mo. Banc 2024) (citing *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. banc 2008)). "Official Immunity is intended to provide protection for individual government actors who, despite limited resources and imperfect information, must exercise judgment in the performance of their duties." *Southers*, 263 S.W.3d at 611. The purpose of official immunity is to "allow public officials to

21

make judgements affecting the public safety and welfare without the fear of personal liability." *Love*, 689 S.W.3d at 495 (citing *State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 190 (Mo. banc 2019). If an officer is to be put in fear of financial loss at every exercise of his official functions, then the interest of the public will inevitably suffer. *Id*. When a public official asserts official immunity, he should be afforded immunity from suit "so long as he was acting within the scope of [his] authority and without malice." *Id*. Further, Courts applying the official immunity doctrine must be cautious as to not construe the doctrine too narrowly "lest they frustrate the need for reliving public servants of the threat of burdensome litigation." *Love,* 689 S.W.3d at 495 (citing *Alsup*, 588 S.W.3d at 191).

Official immunity protects public employees from suit except in two narrow exceptions: (1) when a public official fails to perform a ministerial duty require of the official by law; or (2) when a public official acts in bad faith or with malice. *Id*.; also *Southers*, 263 S.W.3d. at 610. There is no evidence that Defendant Hart violated a ministerial duty. Missouri courts have consistently held that the malice expectation to official immunity "ordinarily requires 'actual intent to cause injury.'" *Carlton,* 688 S.W.3d at 629 (quoting *Throneberry v. Mo. State Highway Patrol*, 526 S.W.3d 198, 204 (Mo. Ct. App. W.D. 2017)). The test for malice for purposes of official immunity is two-pronged, requiring both (i) "an *act* contrary to duty and done with a wicked

purpose" and (ii) with "an actual *intent* to injure or prejudice another." *Id.* at 630. Indeed, this Court found that "[i]t is abundantly clear . . . that reckless conduct alone does not amount to malice; there must also be evidence that the official had the *intent* to injure or prejudice the plaintiff." *Id.* at 631; *see also Gray-Ross v. St. Louis Pub. Schs.,* 643 S.W.3d 665, 670, n.1 (Mo. App. E.D. 2022) (finding an allegation that a public official acted willfully and recklessly with a reckless indifference to and conscious disregard for the safety of others did not sufficiently plead the malice exception. because it did not include an allegation that the official intended her action to be prejudicial or injurious"). Thus, if there is no evidence that establishes, nor creates a reasonable inference, that a public official acted wantonly and with actual intent—not recklessness—to cause injury, then that public official is entitled to official immunity. *Love*, 689 S.W.3d at 495-96; *Carlton,* 688 S.W.3d at 630.

Defendant Hart applied pepper spray to recalcitrant inmates refusing directives and disobeying orders with the intent to restore order and to prevent further disobedience by surrounding inmates in the housing unit. Correctional officers were outnumbered by inmates and faced with a large group of inmates refusing directives to disperse from their group. The safety and security of officers and the institution is a compelling governmental interest. *Cutter,* supra. Defendant Hart did not act with intent to injury. Defendant Hart acted

with the intent to restore order and maintain the safety and security of the institution.

In addition, the testimony regarding the specific acts of Defendant Hart's subsequent unlawful use of force does not point to malice in this case. There was no testimony that Dwight Abernathie, the inmate involved in that suit, was either African American nor Muslim. That incident, which can be considered by the jury only in determining Hart's motive, intent, lack of mistake, or lack of accident, does not point to his executing this discretionary duty with malice towards these Plaintiffs.

As such, under Missouri law he is entitled to official immunity which bars Plaintiff's battery claim. As such, judgment as a matter of law in Defendant's favor is appropriate.

## VI. Defendants are entitled to qualified immunity as a matter of law.

Defendants are equally entitled to judgment as a matter of law because they are each entitled to qualified immunity.

State officials, such as police and correctional officers, "are entitled to qualified immunity under §1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). A right is clearly

established only when "existing precedent [has] placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The precedent must have been in place "at the time of the challenged conduct." *Reichle*, 566 U.S. at 664.

Clearly established law cannot be defined "at a high level of generality." *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 614 (2015) (quoting *al-Kidd*, 563 U.S. at 742). After all, "[q]ualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures." *Id.* This ensures police officers (and in this case, corrections officers) have "breathing room to make reasonable but mistaken judgments[] and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, 574 U.S. 13, 17 (2014) (per curiam) (quoting *al-Kidd*, 563 U.S. at 743). Accordingly, the right in question must be "particularized…so that the contours of the right are clear to a reasonable official." *Reichle*, 566 U.S. at 665 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (quotation marks omitted). Plaintiffs cannot overcome this hurdle.

As discussed previously, Plaintiffs' have failed to show that Defendants actions or prison policy prohibiting gatherings and religious assemblies in the common area of the housing units placed a substantial burden on the ability of Plaintiffs' to practice their religious beliefs. Plaintiffs were allowed to pray in

their cells, in the chapel or other approved designated areas following the implemented guidelines regarding disease prevention. Plaintiffs' were allowed their religious items such as prayer rugs, their Kufis, holy books, and Ramadan meals. Outside of the COVID-19 pandemic, they had two weekly religious services in the chapel where they could pray in congregation. They had substantial accommodations for Ramadan (interrupting normal meal service and chapel service times), and had the ability to request additional religious accommodations through the chapel or grievance procedure if they felt their religious needs were not being accommodated. Given the alternatives, and the penological interest in the safety and security of the institution, preventing large gatherings in small quarters like the common area of the housing unit did not create a substantial burden on plaintiffs' ability to exercise their religion and they were not treated unequally compared to those of other religions. Notably, the incident at issue occurred in the midst of the Covid-19 pandemic, where religious assembly was prohibited or severely limited worldwide – not just in the prison setting.

Policy further requires that inmates obey lawful commands, such as a verbal directive to disperse from a large group. Rules 9.1 and 20.1 in the offender rulebook (Plaintiff's Exhibit 11) clearly establish that Plaintiffs were in violation of proscribed inmate conduct. When plaintiffs continuously refused directives to disperse, Defendants were faced with a large group of disobedient

inmates in a housing unit where other inmates may feel encouragement to join in the disobedience. Per policy, when safety and security of the institution, officers, and offenders is at risk, officers are permitted to use pepper spray to restore order and gain compliance. Which is exactly what occurred here.

Given the policy against large gatherings in the common area of the housing unit, the global pandemic procedures implemented at this time, and Plaintiffs' repeated refusal to obey verbal commands to disperse and submit to restraints, Defendants would not be on notice that their actions violated any clearly established constitutional or statutory rights. As such, Defendants are entitled to qualified immunity and judgment as a matter of law is appropriate.

## Conclusion

WHEREFORE, Defendants respectfully ask this Court to enter judgment as a matter of law in their favor under Federal Rule of Civil Procedure 50(a), as plaintiffs' have failed to provide facts establishing any of their claims and because Defendants are entitled to qualified immunity. Defendant asks that no punitive damages be provided, as Plaintiff fails to meet the requisite standard the Defendants acted with malicious intent. Further, Defendants ask this Court to award any other relief it deems just and proper.

Respectfully Submitted,
**CATHERINE L. HANAWAY**
Missouri Attorney General

*/s/ Scott J. Bower*
Scott J. Bower, #75486 (MO)
Isabelle McNally, #78386 (MO)
Wolfgang A. Schaefer, #78191 (MO)
Assistant Attorneys General
221 West High Street
Jefferson City, MO 65101
Phone: (573) 751-8108
scott.bower@ago.mo.gov
isabelle.mcnally@ago.mo.gov
wolfgang.schaefer@ago.mo.gov

*Attorneys for Defendants*

28